Michael J. TEMPESTA, Plaintiff,

v.

MOTOROLA, INC.; Sheila and Timothy Jones, husband and wife; XYZ Corporations or Business Entities I through V, Defendants.

No. Civ.A. 96–448PHXROS.

United States District Court, D. Arizona.

Jan. 20, 1999.

Order on Reconsideration Feb. 2, 2000.

Lawrence Allen Katz, Monica Linn Goebel, Michael Bruce Gerdes, Steptoe & Johnson LLP, Phoenix, AZ, Janice Harrison Moore, Tracey Nicole Fernandes, Gaona Moore PC, Phoenix, AZ, Gayla L. Moss, Motorola Law Department, Chandler, AZ, for Motorola Inc., defendant.

Janice Harrison Moore, Gaona Moore PC, Phoenix, AZ, Gayla L. Moss, Motorola Law Department, Chandler, AZ, for Sheila Jones, wife, Timothy Jones, husband, defendants.

## ORDER

SILVER, District Judge.

### FACTUAL BACKGROUND

This action arises from an employment dispute between Plaintiff Michael J. Tempesta ("Plaintiff") and his former employer, Motorola, Inc. ("Motorola"). Plaintiff began his employment with Motorola in the chemical handling department at some point during or before 1983. (Temporary Employment Agreement, attached to Pls' Notice of Filing Exhibits ("PNFE") as Exh. 15.) When he had health problems as a result of his work in that department, he was reassigned as a temporary worker to the System Support unit in the Purchasing Department. (Coulter Dep. at 75, attached to PNFE as Exh. 2.) As a member of System Support, Plaintiff's primary responsibility was data entry. Plaintiff's accuracy rate was high and Larry McLaughlin ("McLaughlin"), the supervisor of System Support, offered Plaintiff a permanent data entry position within the department. (*Id.*)

McLaughlin already supervised two other data entry employees, Joanne Hardwick ("Hardwick"), who worked part time as a receptionist and part time doing data entry, and Sheila Jones ("Jones"), who is being sued individually in this matter. It is undisputed that Jones had superior expertise in data entry and that her pay grade was higher than that of Hardwick or Plaintiff. (McLaughlin Dep. at 65–67, at-

Judith M. Prakel, Martin Andrew Bihn, Judith M. Prakel PC, Phoenix, AZ, for Michael J Tempesta, plaintiff.

tached to Def.'s Separate Statement of Facts in Supp. of Their Mot. for Summ. J. ("DSOF") as Exh. A). According to Defendant, while Jones had no role in preparing performance reports or wage increases for Hardwick or Plaintiff, she was responsible for overseeing their output to ensure that the work got done. (*Id.*) Plaintiff claims that Jones had no supervisory role in the department, though he supports this primarily with statements by Motorola employees who attested to having no knowledge of Jones having supervisory authority over Plaintiff. (McCartan Dep. at 42, attached to PNFE as Exh. 5, noting that he didn't "recall ever hearing that [Jones] was made a supervisor"; Coulter Dep. at 19, attached to PNFE as Exh. 2; Altfeltis Dep. at 21, attached to PNFE as Exh. 6.)

In February of 1994, Kathleen Hand became the Manager of the Purchasing Department. (Hand Dep. at 22, attached to PNFE as Exh. 8.) The second in command in the department was Terry Hanley ("Hanley"), who was McLaughlin's immediate supervisor. According to Plaintiff, Hand harbored a longstanding hostility towards men. Plaintiff's wife, who worked with Hand before she was promoted to Purchasing Manager, claimed in 1990 Hand made derogatory comments about men at an office event celebrating the promotion of Hand's supervisor. (A. Tempesta Dec. at ¶¶ 7–8, attached to PNFE as Exh. 10.) Hand's statements allegedly included the comments that "in my book, a good man is a dead man" and "When I'm in a position like that, it will be, girls." (Id. at ¶ 8.) Plaintiff contends that once Hand joined the Purchasing Department, she put this promise into practice, discriminating against men in hiring and promotions within the department. Plaintiff also contends that Hand discriminated against older people by hiring and promoting employees with college degrees and by instituting an evaluation tool which measured an employee's potential for promotion as a favorable quality. (Hanley Dep. at 40, attached to PNFE as Exh. 7.) Plaintiff claims that these practices disproportionately harmed older employees with-

in the department. (Jenkins Dep. at 18, attached to PNFE as Exh. 6.) Plaintiff notes the names of several young women who were hired or promoted after Hand became the manager of the department. (Tempesta Dep. at 120, attached to DSOF as Exh. D.) However, as Plaintiff acknowledges, several male employees and people over forty were also hired or promoted within that time period. (Id. at 22–23, 215.) Plaintiff further admits that around the time of Hand's arrival in the Purchasing Department, the department was predominately comprised of male employees over 40 years of age. (Jenkins Dep. at 18, attached to PNFE as Exh. 6.)

At some point after Plaintiff was given a permanent position in the Purchasing Department, his relationship with Jones became increasingly strained. (Tempesta Dep. at 198–202, attached to PNFE as Exh. 1.) Plaintiff claims Jones interfered in his work, which he resented. (*Id.*) According to Defendant, Jones was simply doing her job, including monitoring the data entry workload, dividing work projects between Hardwick and Plaintiff, and overseeing the output to ensure that the work was accomplished. (Jones Dep. at 19, attached to DSOF as Exh. C.)

According to Defendant, in 1995, Motorola instructed all departments to assess their personnel needs. (McLaughlin Dep. at 37, attached to DSOF as Exh. A.) McLaughlin produced a chart indicating that the data entry workload had diminished dramatically due to the use of a new computer program. (*Id.* at 38–39; Work Load Chart, attached to DSOF as Exh. C.) This was the first time McLaughlin had prepared such a chart and it only analyzed certain portions of the data entry workload. (McLaughlin Dep. at 37, attached to DSOF as Exh. A.) It did not reflect the entry of vendor stock tickets or light maintenance of office equipment, which Plaintiff claims constituted a significant portion of his responsibilities. (*Id.* at 19–20.) Defendant claims that based on the results of McLaughlin's chart, the department could

no longer justify both Hardwick's and Plaintiff's positions. (*Id.* at 54.) Hardwick, who had more seniority than Plaintiff, was retained and Plaintiff was informed in April or May of 1995 that his job had been eliminated. (*Id.*) He was given thirty days in which to find another job. (Tempesta Dep. at 299, attached to PNFE ad Exh. 1.) In June of 1995, Plaintiff was offered a position in Motorola's chemical handling department which was Defendant deemed a "promotional move". (Propster Email of 6/6/95, attached to DSOF as Exh. E; Propster Email of 7/14/95, attached to DSOF as Exh. F.) There is a dispute regarding whether Plaintiff was offered an additional position or not, but it is undisputed that Plaintiff was offered at least one position with the same pay grade as his data entry job. (Bedford Letter of 4/16/96, attached to DSOF as Exh. J.) Plaintiff informed Defendant that he was medically incapable of working as a chemical handler due to an allergy to chemicals. (Propster Email of 7/14/95, attached to DSOF as Exh. F.) He documented this with a letter from a doctor written in 1985 identifying the problem and reporting that the condition would last a "lifetime." (Defendant's Letter of 9/10/85, attached to PNFE as Exh. 13.) However, when Plaintiff, at Defendant's request, updated this medical information after a December 1995 visit to a doctor, Defendant was informed that there was "no reason unique to Mr. Tempesta which would disqualify him from working with chemicals with appropriate worker protection." (Kolecki Letter of 12/28/95, attached to DSOF as Exh. G.) Defendant continued to communicate with Plaintiff about possible reassignment, but when Plaintiff failed to accept the chemical handling offer, Defendant concluded that Plaintiff had abandoned his employment with Motorola. (Bedford Letter of 4/16/96, attached to DSOF as Exh. J.) In response, Plaintiff claims Defendant is liable for age and gender discrimination under Federal and state statutes,[1] breach of contract, and intentional infliction of emotional harm.

Plaintiff has also brought a claim of intentional interference with contractual relations against Jones. Defendants filed a motion for summary judgment on July 1, 1998 and Plaintiff filed a cross-motion for partial summary judgment on his discrimination claims on August 24, 1998.

## LEGAL ANALYSIS

Fed.R.Civ.P. 56(c) authorizes the granting of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Judgment for the moving party must be entered "if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "If reasonable minds could differ as to the import of the evidence," judgment should not be entered in favor of the moving party. *Id.* at 250–251, 106 S.Ct. 2505.

The moving party bears the initial burden of identifying the elements of the claim in the pleadings, depositions, answers to the interrogatories, affidavits, and other evidence, which the moving party "believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *S.E.C. v. Seaboard Corp.,* 677 F.2d 1301, 1305–06 (9th Cir. 1982). The burden then shifts to the nonmoving party to establish that there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. More than a "metaphysical doubt" is required to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*

1. Plaintiff initially brought a claim under the Americans With Disabilities Act, but he has since dropped this claim. (Trans. of December 21, 1998 Hearing.)

475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The parties bear the same substantive burdens of proof as would apply at a trial on the merits. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. In a summary judgment motion, the Court does not weigh the evidence or the credibility of witnesses, rather "the nonmovant's version of any disputed issue of fact is presumed correct." *Eastman Kodak Co. v. Image Technical Serv., Inc.,* 504 U.S. 451, 458, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

## I. Plaintiff's Statutory Claims:

### A. Discrimination:

Plaintiff alleges that Defendant has discriminated against him on the basis of age and gender in violation of federal and state statutes.[2] Both parties rely exclusively on federal case law in their discussion of Plaintiff's discrimination claims, agreeing that Arizona courts look to federal precedent in interpreting the Arizona Civil Rights Act.

### 1. Gender:

■ In order to establish a prima facie case of unlawful gender discrimination, a plaintiff must offer evidence that "give[s] rise to an inference of unlawful discrimination." *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1220 (9th Cir.1998). A plaintiff can establish the requisite level of proof in one of two ways. He can establish discrimination with direct evidence of discriminatory intent. *Id.* Alternatively, a plaintiff can establish a prima facie case of unlawful discrimination indirectly by relying on the factors set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), which require a showing that: (1) the plaintiff is a member of a protected class; (2) he was performing according to his employer's le-

gitimate expectations; (3) he suffered an adverse employment action, and (4) other employees with qualifications similar to his own were treated more favorably.

■ If the plaintiff succeeds in making a prima facie case, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory justification for the adverse employment decision. *Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 889 (9th Cir.1994). If the employer succeeds, the burden then returns to the plaintiff to establish that the stated rationale for the adverse action was actually a pretext for discrimination. *Id.* The plaintiff can establish pretext " 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' " *Godwin,* 150 F.3d at 1220 (citation omitted); *Wrighten v. Metropolitan Hospitals, Inc.,* 726 F.2d 1346, 1354 (9th Cir.1984). If the plaintiff offers direct evidence of discriminatory intent, he can survive summary judgement "even if the evidence is not substantial."[3] *Godwin,* 150 F.3d at 1221. In fact, the evidence "need be 'very little.' " *Id.* (citation omitted). However, a plaintiff may not have direct evidence and may instead rely on "circumstantial evidence that tends to show that the employer's motives were not the actual motives because they are inconsistent or otherwise not believable." *Id.* at 1222. If this is the case, Plaintiff's evidence must be " 'specific' " and " 'substantial' " in order for the plaintiff to survive summary judgment. *Id.* (citation omitted).

■ Plaintiff's gender discrimination claim alleges that Hand harbored discriminatory animus towards men which was evidenced in her favorable treatment of women in hiring and promotion decisions

**2.** In Plaintiff's First Amended Complaint, Plaintiff also alleges that Defendant has discriminated against him on the basis of disability. At oral argument on Defendant's Motion for Summary Judgment, Plaintiff's counsel conceded that Plaintiff was no longer pursu-

ing a claim under the Americans with Disability Act (ADA), 42 U.S.C. § 12112.

**3.** Direct evidence is that which " 'if believed, proves the fact [of discriminatory animus] without inference or presumption.' " *Id.* (citation omitted).

in the Purchasing Department. Plaintiff attempts to establish discriminatory animus directly with the comments about men that Hand allegedly made to Plaintiff's wife, Angela Tempesta. However, such comments only constitute direct evidence if, assuming their truth, they would "prove[ ] the fact of [discriminatory animus] without inference or presumption." *Godwin,* 150 F.3d at 1220 (citing examples of comments that would constitute direct evidence, including an employer's reference to a Mexican–American employee as a "dumb Mexican"); *Schnidrig v. Columbia Machine, Inc.,* 80 F.3d 1406, 1411 (9th Cir.1996) (employer's response, repeated on three separate occasions, that plaintiff was too old to be considered for a job was not merely a "stray remark"). When the comment at issue is "not tied directly to [the employee's] termination" it is insufficient to establish discriminatory animus. *Nesbit v. Pepsico, Inc.,* 994 F.2d 703, 705 (9th Cir.1993) (affirming the lower court's ruling that a supervisor's comment made during a business meeting that "[w]e don't necessarily like grey hair" was "at best weak circumstantial evidence of discriminatory animus" in the plaintiff's age discrimination claim); *Merrick v. Farmers Ins. Group,* 892 F.2d 1434, 1439 (9th Cir. 1990) (" 'stray' remarks are insufficient to establish discrimination"). In the instant case, Hand's alleged comments, while negative towards men in general, were allegedly made at an office social gathering in 1990, four years before Hand became the manager of the Purchasing Department. Thus, under *Nesbit,* Hand's comments do not constitute direct evidence of discriminatory animus. 994 F.2d at 705.

■ Plaintiff must therefore rely on indirect evidence according to the factors outlined in *McDonnell Douglas Corp. v. Green.* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668. Plaintiff has met his burden on the first two factors: while there is some dispute about the caliber of Plaintiff's typing and interpersonal skills, Plaintiff has offered admissible evidence that he was performing according to his employer's legitimate expectations and Plaintiff is

a member of a protected class based on his gender. (Jenkins Dep. at 12, attached to PNFE as Exh. 6; McCartan Dep. at 27, attached to PNFE as Exh. 5.) However, Plaintiff fails to establish the third factor, that he was rejected from a position by the allegedly discriminatory decision-maker despite his qualifications. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. Notably, Plaintiff fails to establish that he actually applied for any positions after Hand became the manager of the department. Plaintiff states that "[i]n the first quarter of 1994," he "had already applied for more than one position in Purchasing . . . through Terry Hanley." (Tempesta Dec. at ¶ 6, attached to PNFE as Exh. 9.) Because Plaintiff applied for these jobs through Hanley and Hand did not begin her job in the Purchasing Department until sometime in February, Plaintiff cannot claim that he was denied these positions due to Hand's discriminatory practices. And while Plaintiff claims that he was interested in opportunities within the department aside from the jobs mentioned above, he does not point to any specific jobs that he applied for and was denied. Moreover, even if Plaintiff had done so, he fails to provide sufficient evidence to allow the Court to compare his qualifications with those of any female employee who received a promotion or pay increase Plaintiff claims he was denied. Plaintiff offers his own *opinions* about the educational background of some of the women who were promoted (Tempesta Dec. at ¶ 9, attached to PNFE as Exh. 9), but these opinions are inadmissible because Plaintiff offers no first hand knowledge of the facts to which he attests. Furthermore, even if Plaintiff had offered admissible evidence regarding the educational background of the female candidates, he has offered no information regarding their work experience or other qualifications. Without this information, the Court has no basis for determining whether Plaintiff was passed over in favor of women who were similarly situated or whether the female applicants

had superior qualifications.[4] Thus, Defendant is entitled to summary judgment on Plaintiff's claim of gender discrimination.

### 2. Age:

 Plaintiff also claims that Defendant's hiring, promotion, and merit increase decisions impermissibly favored employees under age 40 at the expense of older employees in violation of the ADEA.[5] Part of this claim is based on the same allegations that he raises in his gender discrimination claim—that younger candidates for hiring and promotion were given preferential treatment over him. The burden of proof in an ADEA discrimination claim is similar to that in claims arising under Title VII. *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1420 (9th Cir.1990). A plaintiff must show that he was between 40 and 70 years old, that he was performing his job in a satisfactory manner, that he was treated unfavorably, and that he was either replaced by or given less favorable treatment than " 'a substantially younger employee with equal or inferior qualifications.' " *Nesbit*, 994 F.2d at 704–5 (citation omitted). Thus, in order to establish that younger employees were favored in promotion and pay raise decisions over older employees, Plaintiff must show that the older employees were at least as qualified as the younger employees. Plaintiff's ADEA allegation of disparate treatment fails for the same reasons as his Title VII claim: Plaintiff has failed to provide sufficient admissible evidence of the qualifications of the younger women who did receive the promotions and pay increases

Plaintiff claims he was denied. Without this evidence, the Court cannot determine whether the younger employees and Plaintiff were similarly situated.[6]

 Plaintiff also attempts to argue that the methods used to select and evaluate employees, while facially neutral, disparately impacted older employees in violation of the ADEA. In particular, he challenges Hand's preference for employees with college degrees and her use of an evaluation tool that was partially based on an employee's potential for promotion as favoring younger employees over older ones.[7] Disparate impact claims "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *International Brotherhood of Teamsters v. U.S.*, 431 U.S. 324, 325, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). The focus in a disparate impact claim is generally "on statistical disparities, rather than specific incidents, and on competing explanations for those disparities." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 987, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). Plaintiff points to evidence that Hand implemented a policy favoring applicants with college degrees for hiring and promotion (Hanley Dep. at 40, attached to PNFE as Exh. 7.) However, he fails to offer evidence connecting this policy with any pattern of discrimination. As the Supreme Court has stated:

---

**4.** It is worth noting that some of the employees who were hired or promoted during Hand's tenure were men. (Tempesta Dec. at ¶ 6, attached to PNFE as Exh. 9; Hanley Dep. at 41, attached to PNFE as Exh. 7.)

**5.** Plaintiff cannot argue that was discharged because of age discrimination, since he was replaced by Harwick, who is older than Plaintiff.

**6.** Moreover, as Plaintiff acknowledges, some employees over forty were given promotions or hired by Hand. (Tempesta Dep. at 22–23, attached to DSOF as Exh. D.)

**7.** There is some indication that disparate impact theories of liability may not be viable under the ADEA, as the Supreme Court suggested in *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). However neither the Supreme Court nor the Ninth Circuit has explicitly resolved the issue. *Id.; Mangold v. California Public Utilities Com'n*, 67 F.3d 1470, 1473 (9th Cir. 1995). Because the Court finds that Plaintiff would not prevail in his disparate impact claim even if he were allowed to bring the claim, the Court need not decide whether a disparate impact claim is available under the ADEA.

Once the employment practice at issue has been identified, causation must be proved; that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group. Our formulations, which have never been framed in terms of any rigid mathematical formula, have consistently stressed that statistical disparities must be sufficiently substantial that they raise such an inference of causation.

*Watson,* 487 U.S. at 994–95, 108 S.Ct. 2777. Plaintiff offers some evidence of younger employees who were hired or promoted during Hand's tenure in the Purchasing Department, but it hardly constitutes "a stark pattern of discrimination unexplainable on grounds other than age." *Rose,* 902 F.2d at 1423. Thus, Plaintiff fails to meet his burden in establishing that ·the policy favoring college degrees violated the ADEA.

Finally, Plaintiff claims that an evaluation tool used to rate employees had a disparately negative impact on the performance rankings of older employees because it rewarded employees' potential for promotion, which is likely to be greater in younger employees. (Hanley Dep. at 92, attached to PNFE as Exh. 7.) However, at oral argument Plaintiff's counsel conceded that this evaluation tool was not completed until after Plaintiff's job had been eliminated. Therefore, Plaintiff cannot claim to have been harmed by its use and his disparate impact claim regarding the evaluation tool fails. Because Plaintiff fails to establish an ADEA violation from any of the challenged practices under either a disparate impact or treatment theory, summary judgment will be granted on his ADEA claim.

### B. Retaliation:

Under Title 42 U.S.C. § 2000e–3, an employer cannot discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter." While this provision applies only to Title VII claims, the ADEA contains a similar provision and courts have relied on Title VII case law in analyzing ADEA retaliation claims. *Wallis,* 26 F.3d at 888 ("We combine the Title VII and ADEA claims for analysis because the burdens of proof and persuasion are the same."). Thus, it is appropriate to apply the same analysis to Plaintiff's retaliation claims under Title VII and the ADEA.

The burdens of proof in unlawful retaliation claims under Title VII and the ADEA are the same as those set forth in *McDonnell·Douglas,* 411 U.S. at 802–04, 93 S.Ct. 1817 for Title VII suits based on non-retaliation theories of liability. *Cohen v. Fred Meyer, Inc.,* 686 F.2d 793, 796 (9th Cir.1982). As a threshold matter, an employee bringing a retaliation claim must establish a prima facie case by showing that he engaged in a protected activity, that he was thereafter subjected to adverse employment action by his employer, and that there was a causal link between the two. *Wallis,* 26 F.3d at 891. "To show the requisite causal link, the plaintiff must present evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Cohen,* 686 F.2d at 796. The requisite degree of proof required to establish a prima facie case of retaliation on summary judgment is "minimal and does not even rise to the level of a preponderance of the evidence." *Wallis,* 26 F.3d at 889.

If the plaintiff succeeds in making a prima facie case, the burden shifts to the employer to articulate a legitimate justification for the adverse employment decision. *Wallis,* 26 F.3d at 889. Defendant "need not prove the absence of retaliatory intent or motive; it simply must produce evidence sufficient to dispel the inference of retaliation raised by the plaintiff." *Cohen,* 686 F.2d at 796. If the employer makes such a showing, the burden then returns to the plaintiff to establish that the action was really motivated by retaliatory animus. The plaintiff can establish pre-

text with direct evidence, even if insubstantial, or with indirect evidence if such evidence is "specific" and "substantial." *Godwin*, 150 F.3d at 1221–22.

In the case at hand, Plaintiff claims that Hand discriminated against men over forty in favor of younger women in hiring and promotion decisions. He also asserts that he voiced his opposition to what he perceived as discriminatory practices in several meetings and exchanges of memoranda with Hand, Hanley, and McLaughlin in 1994 and early 1995. (Dec. of Tempesta at ¶¶ 6, 9, 11, 13 14, attached to PNFE as Exh. 9.)[8] These complaints would constitute protected activity under the anti-retaliation provisions at issue. *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 763 (9th Cir.1996) (noting that an employee's opposition activity is protected if it is "reasonable in view of the employer's interest in maintaining a harmonious and efficient operation."). This is particularly true because in order for a plaintiff to show that he engaged in protected activity, he need not establish that the conduct he objected to violated the relevant statutes. *Gifford v. Atchison, Topeka and Santa Fe Railway Co.*, 685 F.2d 1149, 1157 (9th Cir.1982). Rather, "an employee who opposes employment practices reasonably believed to be discriminatory is protected by the 'opposition clause' whether or not the practice is actually discriminatory." *Id.* This is based on the underlying notions that an employee would be chilled from engaging in protected activity if he was uncertain whether the conduct at issue would ultimately be found to be unlawful and that "it requires a certain sophistication for an employee to recognize that an offensive employment practice may represent . . . discrimination that is against the law." *Id.*

A jury could conclude that Plaintiff's belief that Hand's practices were discriminatory was unreasonable. For instance, the anti-male comments that Hand allegedly made at an office social gathering several years before Plaintiff's job elimination could be found to be too remote from the allegedly discriminatory practices at issue.[9] A jury could also conclude that the comments were not serious expressions of an intent to discriminate against men, given the context in which they were spoken, or that Plaintiff's wife's purported vivid recollection of the statements after three years was not credible. (A.Tempesta Dec. at ¶¶ 7–8, attached to PNFE as Exh. 10.) Finally, a jury may consider Plaintiff's belief that Hand discriminated against older men unreasonable given the qualifications of the employees who were hired or promoted and the fact that the Purchasing Department was primarily male and over 40 when Hand became the manager. However, these determinations would present credibility issues, which the Court cannot engage in at the summary judgment stage. *Eastman*, 504 U.S. at 458, 112 S.Ct. 2072. Thus, Plaintiff has succeeded in creating a genuine issue of material fact that his expressions of frustration about Hand's hiring decisions constituted protected activity under the ADEA and Title VII.

Plaintiff must also demonstrate that after expressing his complaints to his supervisors, he was subjected to an adverse employment decision. *Cohen*, 686 F.2d at 796. He must also establish a "causal link" between his objection to Hand's hiring decisions and the elimination of his job. *Id.* Plaintiff has offered admissible evidence that he voiced his complaints to Hand, Hanley, and McLaughlin, the three people who made the decision to eliminate his job. (Tempesta Dec. at ¶¶ 6, 9.) He

---

**8.** Plaintiff also complained to Juanita Reeves ("Reeves") of Defendant's "EEOC" department about the allegedly discriminatory practices, but not until after learning that his job in Purchasing would be eliminated. (Tempesta Dec. at ¶ 16, attached to PNFE as Exh. 9.) Thus, this complaint could not have caused

the earlier decision to eliminate Plaintiff's position.

**9.** *See, Wallis*, 26 F.3d 885, 891 n. 5 (refusing to consider events that occurred several years before the employee's termination as evidence of retaliation).

has thus created a genuine issue of material fact that the decision-makers responsible for the adverse employment action knew he had engaged in the protected activity. *Cohen,* 686 F.2d at 797. Plaintiff has also offered evidence that his complaints occurred in sufficiently close proximity to the elimination of his job. *Miller v. Fairchild Industries, Inc.,* 885 F.2d 498, 505 (9th Cir.1989) (noting that the timing of complaints relative to an adverse employment action is relevant in a retaliation inquiry). While a jury might find that he has failed to establish the requisite causal link, Plaintiff has offered the "minimal" amount of evidence required to establish a prima facie case of retaliation.[10] *Wallis,* 26 F.3d at 889.

■ The burden then shifts to Defendant to offer a legitimate, non-discriminatory justification for the elimination of Plaintiff's job. Defendant claims that the data entry workload began to taper off in 1993 due to the gradual introduction of a computerized paperless requisitioning system which reduced the need for data entry employees in the requisition process. (McLaughlin Dep. at 15–16, 18, attached to DSOF as Exh. A.) Defendant also claims that, due to a downturn in business, the company mandated that each department assess its work-to-employee ratio as part of an office-wide attempt to cut costs. (*Id.* at 37.) Defendant asserts that to comply with this directive, McLaughlin created a chart assessing the data entry workload for the period between 1992 and 1995. (*Id.*) The chart showed a substantial reduction in the data entry workload which Defendant attributed to the introduction of the use of the computerized purchasing system. (Hand Dep. at 68, attached to PNFE as Exh. 8, estimating the data entry reduction as "approximately 50 percent.") McLaughlin discussed the chart with Hand, including the "readily obvious conclusion . . . that the data entry workload no longer required two individuals." (McLaughlin Dep. at 54, attached to DSOF as Exh. A.) McLaughlin, Hanley, and Hand decided to eliminate one of the data entry positions and concluded, based on Hardwick's seniority with Motorola, that Plaintiff's job would be eliminated.[11] (*Id.*) This evidence satisfies Defendants' burden of offering substantial evidence of a legitimate, non-discriminatory reason for the elimination of Plaintiff's job.[12]

Because Plaintiff has no direct evidence of retaliation, he must offer " 'specific' and 'substantial' " evidence that Defendant's justification for its decision to eliminate his job was pretextual in order to survive summary judgment.[13] *Godwin,* 150 F.3d

10. Plaintiff also points to the fact that the only job Motorola offered him after his job was eliminated was in the chemical handling department. Plaintiff was told, in a 1985 letter from his doctor, that he had a "lifetime" allergy to chemicals that prevented him from working in jobs that required exposure to chemicals. Plaintiff claims that the fact that Defendant offered him a position that would have required exposure to chemicals was "vindictive." (Pl's Resp. at 10.) However, Defendant made several requests that Plaintiff update his health information after his job was eliminated to determine if the exclusion was still viable after over ten years. When Plaintiff finally went to a doctor, he was informed that he was no more allergic to chemicals than the general population. Thus, Defendant's offer of the chemical handling position is not evidence of retaliatory motive.

11. Plaintiff offers evidence that his job performance was superior to Hardwick's and that during her tenure in the Purchasing Depart-

ment, her primary responsibility was as a receptionist rather than a full time data entry employee. (Brooks Dec. at ¶ 5, attached to PNFE as Exh. 11.) However, Plaintiff cannot seriously contend that Hardwick did not have significant data entry responsibilities, for Plaintiff claims that Hardwick was primarily responsible for inputting purchasing orders, while his primary job was inputting vendor stock tickets. By all indications, the decision to eliminate Plaintiff's job instead of Hardwick's was based on seniority rather than any illegitimate factors.

12. Plaintiff also moves for partial summary judgment against Defendant on his discrimination claims. Based on the Court's conclusion in favor of Defendant on these claims, the Plaintiff's -cross motion will be denied.

13. Plaintiff contends that the statement Hand allegedly made at the office social gathering in 1990 constitutes direct evidence. This

at 1222. Plaintiff's primary means of meeting this burden is to attack the chart used to justify the elimination of Plaintiff's job. Plaintiff asserts that McLaughlin's chart, which purports to represent the workload in data entry, actually only reflects a portion of the work that comprised Plaintiff's job responsibilities. The chart includes purchase orders, purchase order revisions, and new contracts. (McLaughlin Dep. at 20, attached to DSOF as Exh. A.) It does not, however, track vendor stock tickets, new supplier set ups, and some clerical functions.[14] (Id. at 20–21.) It also does not reflect the minor repairs that Plaintiff claims to have been responsible for making on office equipment, a responsibility that McLaughlin allegedly eliminated from Plaintiff's job approximately one month before his position was eliminated. (Tempesta Dec. at ¶ 15, attached to PNFE as Exh. 9; Statement of Data Entry Responsibilities, attached to PNFE as Exh. C.) However, even if some of Plaintiff's job responsibilities were not included in the chart, it is undisputed that the overall data entry workload in the department declined dramatically as a result of the new computer system. Thus, even if some of Plaintiff's responsibilities remained constant, the substantial decline in the remaining workload legitimately justifies the elimination of one data entry position. Moreover, though Plaintiff claims that other Motorola employees are currently doing the work he formerly performed, he points only to the hiring of a summer intern in the Purchasing Department two weeks before Plaintiff left Motorola. While the intern may have input some vendor stock tickets along with his other responsibilities (Jenkins Dep. at 35, attached to PNFE as Exh. 6), he left the Purchasing Department a few months after the summer ended and has not been replaced. (Id.) Because Plaintiff has not offered evidence sufficient to create a genuine issue of material fact on whether Defendant's proffered justifications for Plaintiff's job elimination were pretextual, summary judgment on Plaintiff's retaliation claims under the ADEA and Title VII will be granted.[15]

## II. Plaintiff's Breach of Contract Claim:

Plaintiff does not claim that he entered into a written contract with Defendant. Rather, Plaintiff claims that Defendant violated "[s]everal Motorola policies in the course of Hand's desperate attempt to get Tempesta out of her department." (Pl's Resp. at 11.) However, Plaintiff's response to Defendant's motion for summary judgment on this claim consists of five lines. The only specific policy Plaintiff cites is Policy No. 1260, which imposes restrictions on Defendant's ability to terminate Motorola employees who have been with the company for over ten years. (Policy No. 1260, attached to PNFE as Exh. 8.) Specifically, the policy provides:

> prior approval of the CEO as recommended by the Sector/Group Director of Personnel is required before such an employee can be separated for one or more of the following reasons. . . . 2) In

Court has already concluded that Hand's comments were "stray remarks." Moreover, it is illogical that a statement made three years before Plaintiff's job was eliminated and long before Plaintiff's complaints about Hand's hiring practices could constitute direct evidence of Hand's intent to *retaliate* against Plaintiff.

14. McLaughlin claims that he did not track vendor stock tickets because it was a task that his department was asked by another department to take over, so "we just assumed the task without keeping track of the number of tickets." (Id. at 30.)

15. Plaintiff alleges that Defendant violated public policy by failing to promote or give pay raises to Plaintiff and by eliminating his job. However, these claims are predicated on a finding that Defendant impermissibly discriminated against Plaintiff on the basis of age and gender. Because the Court finds that Plaintiff did not suffer gender or age discrimination, his public policy claim on this issue also fails. *Gesina v. General Elec. Co.*, 162 Ariz. 35, 780 P.2d 1376, 1379 (Ariz.App.1989) (relying on ADEA in its analysis of plaintiff's claim of wrongful termination in violation of public policy).

the case of Involuntary Separations occasioned by the closing of a facility or elimination of jobs, separation may not occur without documented evidence that reasonable efforts have been made to identify and reassign employees to jobs for which they are qualified within the Company.

(*Id.*) Defendant is correct in noting that Plaintiff must do more than recite Hand's statement that she could not confirm whether Policy No. 1260 was followed in Plaintiff's termination if he is to establish a breach of contract violation. (Hand Dep. at 225–26, attached to PNFE as Exh. 8.) However, while Plaintiff fails to elaborate on how he believes this policy has been violated, he apparently believes that Defendant did not make reasonable efforts to reassign him to another position within Motorola after his data entry job was eliminated.[16] Because Plaintiff has worked for Motorola for over ten years, this could constitute a violation of the policy.

 The Arizona Supreme Court has held that the "terms in an employer's policy statements regarding such things as job security and employee disciplinary procedures...may become part of the contract, supplementing the verbalized at-will agreement, and thus limiting the employer's absolute right to discharge an at-will employee." *Wagenseller v. Scottsdale Memorial Hosp.,* 147 Ariz. 370, 710 P.2d 1025, 1036 (1985). Moreover:

> Whether any particular personnel manual modifies any particular employment at-will relationship and becomes part of the particular employment contract is a *question of fact.* Evidence relevant to this factual decision includes the language used in the personnel manual as well as the employer's course of conduct and oral representations regarding it.

*Id.* (quoting *Leikvold v. Valley View Community Hospital,* 141 Ariz. 544, 688 P.2d

170, 173 (1984)). Defendant has offered evidence that its personnel department did try to reassign Plaintiff to other jobs and that Plaintiff waited several months to update his medical records despite Defendant's repeated requests for the updated information so that they could determine appropriate positions within the company. (7/14/95 Letter to Plaintiff, attached to DSOF as Exh. F; 12/28/95 Letter to Nancy Simpkins, attached to DSOF as Exh. G.) However, fact questions remain regarding whether whether Policy No. 1260 was incorporated into the at-will agreement between the parties and if so, whether Defendant's efforts to relocate Plaintiff were reasonable. Thus, summary judgment on this claim will be denied.

### III. Plaintiff's Intentional Infliction of Emotional Harm Claim:

 Plaintiff also claims that Defendant is liable for intentional infliction of emotional harm. Plaintiff bases this claim on the fact that his job was eliminated after thirteen years with the company and that he was allegedly not given sufficient time to find another job. (Tempesta Dep. Vo. II at 295, 298, attached to DSOF as Exh. D.) In addition, Plaintiff cites the allegedly harassing treatment he received by Jones, who "was protected by Motorola in her actions." (Pls' Resp. at 11.) Plaintiff claims that Defendant's conduct caused him emotional distress, prompting him to visit a therapist once. (Tempesta Dep. Vo. II at 296, attached to DSOF as Exh. D.)

 An intentional infliction of emotional distress claim requires proof that the conduct was "extreme" and "outrageous", that the defendant either intended to cause emotional distress or recklessly disregarded the near certainty that such distress would result from his conduct, and that he suffered severe emotional distress as a result of defendant's conduct. *Ford v.*

---

**16.** Plaintiff also appears to contend that Defendant had a policy requiring Defendant to give employees ninety days of employment after receiving notice of termination. Plaintiff claims that he was only given thirty days

before he was required to leave the company. However, Plaintiff can point to no particular policy referencing a ninety day requirement. Thus, this allegation does not form the basis for his breach of contract claim.

*Revlon, Inc.,* 153 Ariz. 38, 734 P.2d 580, 585 (1987). Arizona courts have refused to allow plaintiffs to prevail in such claims unless defendant's conduct is found to be extraordinary. "A plaintiff must show that the defendant's acts were 'so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.' " *Mintz v. Bell Atlantic Systems Leasing,* 183 Ariz. 550, 905 P.2d 559, 563 (Ariz.App.1995) (citation omitted). In *Mintz,* for example, an Arizona appeals court affirmed the trial court's dismissal of an emotional distress claim brought by an employee who claimed to have suffered an emotional breakdown as a result of gender discrimination at work. *Id.* at 561. Although the employee was hospitalized for severe emotional and psychological problems, the employer terminated her disability benefits and ordered her to return to work several weeks before her doctor's recommendation. *Id.* She returned to work as directed, but was rehospitalized the following day and was subsequently fired by a letter the employer delivered to her hospital room. *Id.* Despite the conduct of the employer in *Mintz,* the court concluded that it did not " 'go beyond all possible bounds of decency,' even if it was motivated by sex discrimination or retaliation." *Id.* at 563.

Even if all the allegations against Defendant in the instant case were assumed to be true, Defendant's conduct would fall far short of the employer's actions in *Mintz. Id.* Thus, Defendant's motion for summary judgment on intentional infliction of emotional distress will be granted.

*IV. Plaintiff's Intentional Interference with his Employment Claim:*

■ Plaintiff claims that Jones intentionally interfered with his employment and brings this claim against Jones in her individual capacity. Plaintiff's complaints against Jones span a range of issues, including her alleged mistreatment of him, her alleged comments to his supervisors and co-workers about him, and her alleged involvement in overseeing his work, a role Defendant claims was included in her responsibilities and which Plaintiff challenges. The actors involved offer differing accounts of these matters, but it is clear there was considerable friction between Jones and Plaintiff.

■ It is not clear, however, that such friction between co-workers merits legal action. It is true, as Plaintiff points out, that the Arizona Supreme Court has held that an employee can bring an intentional interference with employment claim against a supervisor for maliciously causing the plaintiff to be terminated.[17] *Wagenseller,* 710 P.2d at 1043. In *Wagenseller,* however, the plaintiff's supervisor had allegedly caused plaintiff's termination by, among other things, refusing to participate in group "mooning" on a camping trip with co-workers. *Id.* at 1029. In the case at hand, Plaintiff merely alleges that Jones attempted to cast Plaintiff's work performance in a negative light. Moreover, Plaintiff has failed to establish that, even if the allegations regarding Jones were true, his employment contract with Defendant was in any respect "disrupted". *Id.* at 1041. Plaintiff's only support for his claim that Jones's conduct led to the elimination of his position is a statement from Hanley that Plaintiff had "los[t] control" during the altercation between Jones and Plaintiff. (Hanley Dep. at 135, attached to PNFE as Exh. 7.) Hanley adds, however, that the decision to eliminate Plaintiff's job was based solely on seniority, and that Hanley, Hand, and McLaughlin did not discuss Plaintiff's job performance in the meeting in which the decision was made. This evidence is uncontroverted. (*Id.* at

---

**17.** The elements of a claim of intentional interference with contract are as follows: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. *Id.* at 1041.

107.) Furthermore, McLaughlin stated that he does not recall any complaints made by Jones about Plaintiff. (McLaughlin Dep. at 67, attached to DSOF as Exh. B.) Because Plaintiff has offered no support for his claim that Jones' conduct had any effect on the decision to terminate his position, summary judgment will be granted on his claim against Jones.[18]

Accordingly,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment on Plaintiff's ADA claim (Doc. 86) is granted.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment on Plaintiff's ADEA claim (Doc. 86) is granted.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment on Plaintiff's Title VII claim (Doc. 86) is granted.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment on Plaintiff's Arizona Civil Rights Act claims (Doc. 86) is granted.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment on Plaintiff's public policy claim (Doc. 86) is granted.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment on Plaintiff's Breach of Contract claim (Doc. 86) is denied.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment on Plaintiff's Intentional Infliction of Emotional Distress claim (Doc. 86) is granted.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment on Plaintiff's Intentional Interference with Contract claim (Doc. 86) is granted.

**IT IS FURTHER ORDERED** that Plaintiff's Cross–Motion for Partial Summary Judgment (Doc. 94) is denied.

## MEMORANDUM AND ORDER

YOUNG, District Judge.[1]

### I. *Introduction*

This is an employment dispute brought by the plaintiff Michael J. Tempesta ("Tempesta") against the defendants Motorola, Inc. ("Motorola"), Sheila Jones ("Jones"), and Timothy Jones. Tempesta and Motorola have moved for reconsideration of Judge Silver's Memorandum and Order dated January 19, 1999, granting the defendants' motion for summary judgment as to all of Tempesta's claims except a breach of contract count, and denying Tempesta's cross-motion for summary judgment. *See Tempesta v. Motorola, Inc.*, No. 96–448–PHX–ROS (D.Ariz. Jan. 19, 1999) (the "Order"). Specifically, Tempesta moves for reconsideration of the order granting summary judgment as to his claims for retaliation and interference with contract; and Motorola moves for reconsideration of the order denying sum-

---

18. Plaintiff also claims that Jones interfered with his pay increases, alleging Jones inappropriately calculated his pay increase when McLaughlin, whose responsibility it was to calculate raises, was on vacation. (Tempesta Dep. at 323, attached to PNFE as Exh. 1.) However, Plaintiff's statements suggest that Jones had authority from McLaughlin to calculate his raise. According to Plaintiff, "[I] asked [McLaughlin] why did she get involved with this? He said, well, I was busy. I couldn't get back in time, and we had to get the paperwork in. I said that wasn't right, that he should do it. He apologized, and then we did the merit review." (*Id.*) Thus, not only does Plaintiff fail to show that he was harmed by Jones' conduct—because McLaughlin raised Plaintiff's initially low review—he also suggests that Jones had been directed by her supervisor to complete the review. (*Id.* at 366.)

Plaintiff also claims that he was denied pay increases because Jones improperly calculated Plaintiff's output to make it seem like he was doing less work than he was. (*Id.* at 324.) However Jones and McLaughlin both dispute this allegation and Plaintiff offers no admissible evidence to the contrary. Without more, Plaintiff fails to withstand summary judgment on this claim.

1. Of the District of Massachusetts, sitting by designation.

mary judgment as to Tempesta's breach of contract claim. Ordinarily, notwithstanding the transfer of this case to this session of the Court, motions for reconsideration would necessarily have to be referred back to Judge Silver. That course is not now open to this Court, however, as she has recused herself from further consideration of this case.

## II. *Factual Background*

The Order contains a complete statement of the factual background to this case. *See* Order at 976–78. For present purposes, it is enough to state: (1) that Tempesta was a data entry operator in Motorola's Purchasing Department in 1995; (2) that in April or May of that year, Motorola informed Tempesta that he would no longer have a job as a data entry operator because of a decreased workload; (3) that Motorola offered Tempesta a job as a chemical handler; (4) that Tempesta refused to accept that job on the ground that he was allergic to chemicals; (5) that Motorola requested Tempesta to submit to an independent medical evaluation; (6) that Tempesta refused to undergo such an evaluation for several months; (7) that when Tempesta did finally submit to an evaluation, the examining physicians found no chemical allergies; and (8) that when Tempesta thereafter continued to refuse to accept the chemical handler position, Motorola concluded that he had abandoned his employment with the company.

## III. *Discussion*

### A. *Tempesta's Motion*

Tempesta argues that Judge Silver's order was in error ·because: (1) the Court gave undue weight to Motorola's evidence of a legitimate, nondiscriminatory motive for terminating Tempesta; and (2) the Court overlooked relevant evidence that created a triable issue of fact with respect to the claim of interference with contractual relations against Jones. Neither of these arguments is successful.

### 1. *Retaliation*

Tempesta argues that the summary judgment record reveals triable issues of fact with respect to his retaliation claim. In the Order, Judge Silver granted summary judgment on the retaliation claim, holding that Tempesta failed to offer the requisite "specific" and "substantial" evidence to establish that Motorola's proffered justification for eliminating his position was a pretext. *See* Order at 985. Motorola claimed that "the data entry workload began to taper off in 1993 due to the gradual introduction of a computerized paperless requisitioning system which reduced the need for data entry employees in the requisition process." *Id.* at 984. In response to a company directive that each department reassess its work-to-employee ratio, Larry McLaughlin ("McLaughlin") created a chart depicting the data entry workload for the period between 1992 and 1995. *See id.* This chart showed a substantial reduction in the data entry workload, leading McLaughlin, Terry Hanley ("Hanley"), and Kathleen Hand ("Hand") to conclude that one of the two data entry positions should be eliminated. *See id.* They decided to eliminate Tempesta's position because the other data entry person, Joanne Hardwick ("Hardwick"), had more seniority. *See id.* Because Tempesta offered no evidence to rebut this legitimate, nondiscriminatory justification, the Court granted summary judgment in Motorola's favor. *See id.*

Tempesta argues that this holding was in error because "McLauglin's chart ... neither shows what the Court apparently thinks it does, nor what Motorola claims that it shows." Tempesta Mem. at 3. First, Tempesta notes that, according to the chart, the data entry workload had declined most precipitously between 1993 and 1994, not 1994 and 1995. Thus, because Tempesta's position was eliminated in 1995, rather than 1994, Tempesta believes that Motorola's motivation must have been something other than the reduction in workload. This argument proves

too much. An employer is under no duty to terminate employees the moment a legitimate business reason for doing so emerges. Indeed, because McLaughlin only created the chart in 1995, Motorola may not have known that a legitimate business reason for terminating Tempesta existed in 1994. Motorola's termination of Tempesta may have been tardy under the logic of ruthless efficiency, but it was not made actionable under the employment laws for that reason. *See Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 986 (10th Cir. 1996) (employment laws not violated by erroneous or illogical business judgment).

█ Second, Tempesta argues that the chart fails to provide a legitimate, nondiscriminatory reason for his termination because "Tempesta was doing virtually no data entry of the type portrayed on Larry McLaughlin's graph either at, or during, a significant period of time before the period that McLaughlin's chart was prepared." Tempesta Mem. at 6. As the Court noted in the Order, however, a decline in the overall volume of data entry is a legitimate justification for eliminating Tempesta's position, even if Tempesta at the time was only handling a subset of data entry duties that had not declined. *See* Order at 985. That is, Motorola could lawfully determine that one of the two data entry positions should be eliminated according to seniority—rather than according to which employee entered the type of data entry that had experienced declining volume. Moreover, Tempesta's argument only proves, at most, that Motorola's decision to terminate him was incorrect, based upon an erroneous interpretation of the chart. It does not cast any doubt on the evidence that Motorola in fact relied upon the chart. *See Billups v. Methodist Hosp.*, 922 F.2d 1300, 1304 (7th Cir.1991) (proper inquiry is whether employer's belief was honestly held); *Dea v. Look*, 810 F.2d 12, 15 (1st Cir.1987) (evidence casting doubt on "correctness" of reason for employment action insufficient to prove pretext).

Third, Tempesta argues that Victor Bobis ("Bobis") took over his job duties after he left Motorola, thereby undermining the view that his job was eliminated from Motorola's personnel structure. As the Court noted in the Order, however, Bobis was a temporary intern who has left Motorola and has not been replaced. *See* Order at 985.

Fourth, Tempesta offers deposition testimony of John McCarten ("McCarten"), Belinda Coulter, and Brenda Altfelsis, each of whom testify that the Purchasing Department—the department within which Tempesta worked—was "busy." *See* Tempesta Mem. at 7–8. Tempesta argues that this testimony "conflicts with Motorola's supposed evidence, from McLaughlin's deposition, that there was somehow a downturn in work in Purchasing." *Id.* at 8. Tempesta, however, has only offered testimony that the Purchasing Department in general was busy. He has done nothing to contradict the McLaughlin chart which showed that the volume of data entry work within the Purchasing Department had declined. Moreover, McCarten's "surprise" that a different position in the Purchasing Department could not be found for Tempesta, *see id.*, is meaningless absent an "affirmative showing" that he had personal knowledge of an available position for which Tempesta was qualified.

█ Finally, Tempesta argues that Motorola's decision to retain Hardwick over him demonstrates an illicit motive because it was allegedly in violation of company policy and because "[t]here is ample evidence in the record that Mike Tempesta's performance was greatly superior to that of [Hardwick's]." *Id.* at 9. Neither of these contentions has merit. The company policy that Tempesta relies upon simply states that "performance, skill and/or service" will be considered in termination situations; it does not state that performance and skill must be considered more heavily than service or that service cannot be considered alone. Thus, even if Tempesta is correct that his performance was "greatly superior" to Hardwick's—a fact which does not leap readily from the

record, *see* Order at 980 (noting that Tempesta's typing skills were criticized in employee reviews)—it would be immaterial as matter of law, given that the company could and did decide to eliminate the data entry position based upon seniority.[2]

Because none of Tempesta's arguments alter the Court's reasoning in the Order, Tempesta's motion for reconsideration is DENIED with respect to the claim for retaliation.

### 2. *Interference with Contractual Relations*

The Court granted summary judgment to Jones on Tempesta's claim that she intentionally interfered with his employment contract with Motorola. Specifically, the Court stated that "[b]ecause [Tempesta] has offered no support for his claim that Jones' conduct had any effect on the decision to terminate his position, summary judgment will be granted on his claim against Jones." Order at 19. In his motion for reconsideration, Tempesta argues that the Court neglected to consider evidence that Tempesta's incident with Jones altered the "perception" that Hanley held of Tempesta, that Hanley wanted Tempesta "gone" because of his problems with Jones, and that Jones herself admitted her role in having Tempesta removed from Motorola. *See* Tempesta Mem. at 12–13.

This evidence is unavailing. First, while Hanley's deposition does contain evidence that he believed Tempesta had "los[t] control" during the altercation with Jones,

Hanley quickly adds that the decision to eliminate Tempesta's position was based solely on seniority. *See* Hanley Dep. at 135. That direct testimony is not undermined by Hanley's admission that his perception of Tempesta (independent of the decision to eliminate Tempesta's position) was altered due to the Tempesta–Jones incident. Second, the testimony that Hanley wanted Tempesta "gone" due to the incident comes in the form of inadmissible hearsay from McCarten. Even were it admissible, the evidence is far more equivocal and insubstantial than Tempesta characterizes it. *See* McCarten Dep. at 59–61 ("Seemed to be a lot of issues going on with Mike and Terry and Larry and Sheila Jones and Kathy Hand within that group where there was a number of different problems that were being addressed and confronted."). Third, the alleged "admission" by Jones that she helped to undermine Tempesta's standing in the department, even if admissible,[3] is not probative of the question of why Motorola decided to eliminate Tempesta's position, an issue about which Jones has no personal knowledge.

Thus, the Court DENIES Tempesta's motion for reconsideration with respect to the interference with contractual relations claim.

### B. *Motorola's Motion*

In the Order, the Court denied Motorola's motion for summary judgment with respect to Tempesta's breach of contract claim, noting that Motorola's Policy No.

---

**2.** Tempesta also argues that the Court failed to credit Kathy Hand's attempt to overturn Brenda Coulter's determination that the Incident Report on the Tempesta–Jones incident was filed to late. Tempesta believes that such an attempt by Hand demonstrates animus against Tempesta. Even if it does, however, it is undisputed that Motorola's human resources department rejected the late-filed report. In other words, Motorola applied its policies to Tempesta's *benefit*, where appropriate.

Finally, Tempesta argues that Motorola's unlawful motivation for terminating him can be seen in its decision to offer him a chemical

handling job despite reports from his physician "recommend[ing] that ... he not take the chemical handler job offered to him." Tempesta Mem. at 10. As the Court noted in the Order, however, when Motorola asked Tempesta to visit independent doctors for evaluations, those doctors reported that Tempesta could perform the job offered to him. *See* Order at 984 n. 10. "Thus, [Motorola's] offer of the chemical handling position is not evidence of retaliatory motive." *Id.*

**3.** The alleged "admission" is recounted in a declaration by Angela Tempesta. *See* Angela Tempesta Decl. at ¶¶ 14–28.

1260 appears to impose restrictions on Motorola's ability to terminate employees that have been with the company for over ten years. *See* Order at 985–86. Tempesta alleged that Motorola failed to undertake reasonable efforts to reassign him after eliminating his data entry position. Motorola offered evidence that its personnel department did try to reassign Tempesta to other jobs and that Tempesta waited several months to update his medical records as requested by Motorola so that they could determine appropriate alternate positions. *See id.* The Court denied summary judgment, however, because "fact questions remain[ed] regarding whether Policy No. 1260 was incorporated into the at-will agreement between the parties and if so, whether [Motorola's] efforts to relocate [Tempesta] were reasonable." *Id.* In so ruling, the Court noted that "[Tempesta] fails to elaborate on how he believes this policy has been violated," and "that [Tempesta's] response to [Motorola's] motion for summary judgment on this claim consists of five lines." Order at 16. Because the record is now more fully developed, and because the record discloses no disputed issues of material fact, the Court GRANTS Motorola's motion with respect to the claim for breach of contract.

Motorola argues: (1) Policy No. 1260 did not create a contractual obligation; (2) Policy No. 1260 by its own terms did not apply to Tempesta's situation; and (3) even if Policy No. 1260 were a contractual obligation applicable to Tempesta's situation, the undisputed evidence establishes that Motorola complied with this obligation. To provide Tempesta with his best chance of withstanding summary judgment, this Court assumes that Motorola fails in both of its first two contentions. That is, despite forceful arguments to the contrary,[4] this Court assumes for purposes of this motion that Policy No. 1260 created a contractual obligation and that it applied to Tempesta's situation.

■■■ Given those assumptions, the record is still bereft of any evidence indicating that Motorola failed to make "reasonable efforts ... to identify and reassign [Tempesta] to [a] job[ ] for which [he was] qualified within the Company." Motorola Mem. Ex. D. (Policy No. 1260). To the contrary, the record indicates that Motorola went out of its way to accommodate Tempesta, granting several extensions of its request for medical evaluations and affording him several warnings before determining that he had abandoned his new position. *See* Tempesta Mem. Ex. F (four Motorola letters to Tempesta).

Tempesta's only argument in opposition to this evidence is that "Tempesta considered the job [offered] physically impossible for him." Tempesta Resp. at 10. When this objection was voiced to Motorola at the time of reassignment, Tempesta relied upon a decade-old report by his physician stating that he was allergic to chemicals. Motorola requested that Tempesta visit independent physicians for a more current medical evaluation, as required by Motoro-

4. Motorola argues that Policy No. 1260 did not create a contractual obligation in light of the "clear" and "conspicuous" disclaimer issued by Motorola within the Policy Manual which stated that "[n]othing in this Manual shall be construed or interpreted to constitute an employment contract between Motorola and any individual employee or group of employees." Motorola Mem. Ex. A. Several other similar disclaimers by Motorola are referenced, as are the decisions of many Arizona courts granting judgment as matter of law to employers who include such disclaimers in their employment manuals.

Motorola also argues that Policy No. 1260 did not apply to Tempesta because he was discharged for cause. The Policy Manual upon which Tempesta relies does not impose a duty to undertake reasonable reassignment efforts when employees are terminated *for cause.* Motorola contends that Tempesta was terminated for cause—specifically, his failure to report for work in his new assignment as a chemical handler. Tempesta claims that he had no duty to report for this new assignment because it was "unreasonable" under Policy No. 1260. Thus, the question of whether Policy No. 1260 applies to Tempesta collapses into the question of whether the chemical handler job constitutes a "reasonable effort" to reassign Tempesta prior to separation.

la's Policy Manual. *See* Tempesta Mem. Ex. F. As the Court has previously noted, "[w]hen [Tempesta] finally went to a doctor, he was informed that he was no more allergic to chemicals than the general population." Order at 984 n. 10. In the Order, the Court held that this evidence was "not evidence of retaliatory motive." *Id.* It now holds that this evidence demonstrates compliance with Policy No. 1260 which requires Motorola to show "documented evidence that reasonable efforts have been made to identify and reassign employees...." Tempesta Mem. Ex. D.

In a final effort to avoid summary judgment, Tempesta offers the disability certificate of Dr. Cruikshank ("Cruikshank") who recommended that Tempesta not take the offered chemical handler job. While this certificate was issued contemporaneous to Tempesta's reassignment, it does not reveal that it was prepared by a doctor qualified to offer an opinion regarding Tempesta's alleged chemical allergies. Cruikshank appears from the certificate to be a doctor of osteopathy. He was treating Tempesta for conditions involving his back and feet—conditions unrelated to the alleged chemical sensitivity. *See* Tempesta Mem. Ex. I. In contrast, the report denying Tempesta's chemical allergies was prepared by Dr. Kunkel ("Kunkel"), an M.D. who specializes in toxicology. *See* Tempesta Mem. Ex. J. In light of these disparities in qualifications, and in light of Tempesta's repeated delay in providing Motorola with evidence of his inability to accept the chemical handler job, Motorola's reliance upon Kunkel's Report was sufficient, as matter of law, to discharge its responsibilities under Policy No. 1260, even if such Policy were construed to be a contractual obligation and to cover Tempesta's situation.

Thus, the Court GRANTS Motorola's motion.

### IV. *Conclusion*

For the foregoing reasons, the Court DENIES Tempesta's motion for reconsideration [Docket # 110] and GRANTS Motorola's motion [Docket # 116] as to

Tempesta's breach of contract claim, the only remaining count in the complaint. Judgment shall enter for the defendants.

SO ORDERED.