Debbie and Conrad MOSAKOWSKI, Plaintiffs,

v.

PSS WORLD MEDICAL, INC., Defendant.

No. CIV. 02–0092 PHXSLV.

United States District Court, D. Arizona.

Dec. 10, 2003.

Neilendra Singh, Jones, Skelton & Hochuli, PLC, J. Daniel Campbell, III, Esq., Jason Edward Hunter, O'Connor & Campbell, PC, Phoenix, AZ, for Plaintiffs.

Peter Christopher Prynkiewicz, Quarles & Brady Streich Lang, LLP, Charles L. Fine, Esq., John Mark Ogden, Robert Shawn Oller, Littler Mendelson, PC, Phoenix, AZ, Timothy B. Strong, Amy H. Reisinger, Coffman, Coleman, Andrews & Grogan, PA, Jackson, FL, for Defendant.

## MEMORANDUM AND ORDER

VERKAMP, United States Magistrate Judge.

Both Plaintiffs and Defendant have consented to the exercise of magistrate judge jurisdiction over this case, including the entry of final judgment. Before the Court is Defendant's Motion for Summary Judgment and Plaintiffs' Motion for Partial Summary Judgment. The Court heard oral argument on these motions on November 6, 2003.

Plaintiffs' complaint, as amended, includes six claims for relief: (1) a Title VII gender-based hostile work environment claim; (2) a Title VII retaliation claim; (3) a Title VII retaliation claim based specifically on an allegation of constructive discharge; (4) intentional infliction of emotional distress; (5) "negligent supervision"; (6) loss of consortium.

## I. Standard for granting a motion for summary judgment

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment shall be entered if the pleadings, depositions, affidavits, answers to interrogatories, and admissions on file show that there is no genuine dispute regarding the material facts of the case and the moving party is entitled to a judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Where the moving party has met its initial burden with a properly supported motion, the party opposing the motion "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

The United States Supreme Court has stated that when a party moving for summary judgment has carried its burden under Rule 56(c), "its opponent must do more

than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). ("[I]f the factual context renders respondents' claim implausible ... respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary.").

■ The Court must consider each party's motion for summary judgment with all reasonable inferences favoring the non-moving party. *See Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1117 (9th Cir. 2001). When cross-motions for summary judgment are filed, the Court must construe all inferences in favor of the party against whom the motion under consideration is made. *See, e.g., O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir.2001).

## II. Factual background

Plaintiff Debbie Mosakowski ("Plaintiff") became an employee of Defendant in 1995. In 1996 or 1997, Plaintiff signed (and backdated) employment paperwork for Defendant which included, directly above Plaintiff's signature, a statement of Defendant's "harassment" policy. *See* Defendant's Statement of Facts in Support of It's Motion for Summary Judgment ("DSOF"), Ex. A at 216, Ex. B; Plaintiffs' Statement of Facts in Support of Their Motion for Partial Summary Judgment ("PSOF"), Ex. 1 at 17. Late in the year 2000, Plaintiff worked primarily with Jesus Bustos and Richard Salinas; all three worked in the purchasing department of Defendant's Phoenix branch. Plaintiff's direct supervisor at that time was Mark Bellwood, Operations Leader of Defendant's Phoenix branch. *See* DSOF, Ex. A at 25–27.

On or about February 26, 2001, Plaintiff discussed her work environment with Mr.

Bellwood, in what she described as a "casual conversation." *Id.*, Ex. A at 54–55. Plaintiff complained to Mr. Bellwood about the use of vulgar language by Plaintiff's two immediate co-workers, Mr. Salinas and Mr. Bustos.[1] *See* PSOF, Ex. 1 at 53. Regarding her co-worker's conversations, Plaintiff wanted her co-workers to "take it down a thousand in her presence," because she wanted the office atmosphere to be "more professional." DSOF, Ex. A at 54–57. Within a few days of this conversation with Plaintiff, Mr. Bellwood spoke to Plaintiff's co-workers about Plaintiff's comments and, according to Plaintiff's deposition testimony, Mr. Salinas and Mr. Bustos ceased engaging in sexually-oriented conversation in her presence. *See id.*, Ex. A at 69–71.

However, after Mr. Bellwood spoke to her co-workers about the workplace atmosphere, Mr. Salinas and Mr. Bustos began to "cold-shoulder" Plaintiff. Plaintiff stated in her deposition:

> I would walk into the room and any conversation that was going on would immediately zip, and I'd, what's going on, you know. And they'd nothing, nothing, you know, and go back to what they were doing. So I'd go to my desk, get whatever I came to get, and go back on my way and hear all of it again.

Well, all right, maybe they were saying something I asked not to hear. But, you know, come back and the—we used to sit at lunch together. Used to be, hey, we're going to lunch. All right, I'll be there in a minute, you know. Or they stopped asking my advice on things. I mean, they just cut off all conversation really.

*Id.*, Ex. A at 59. Plaintiff asserts that her co-workers retaliated against her for complaining about their sexually offensive behavior by ceasing to speak with her and by "slashing her name all over the building." *Id.*, Ex. A at 143.

Plaintiff asserts that this behavior was directly related to her conversation with Mr. Bellwood about her co-workers' behavior. Defendant asserts that Mr. Salinas' and Mr. Bustos' attitude toward Plaintiff changed for other, non-discriminatory reasons.[2] *See* Defendant's Response in Opposition to Plaintiffs' Motion for Partial Summary Judgment. Plaintiff complained to Mr. Bellwood about the "hostile" environment created by Mr. Bustos and Mr. Salinas on three occasions in March of 2000. *See* DSOF, Ex. A at 73–77. Plaintiff asserts Mr. Bellwood did nothing to address her complaints. *See id.*, Ex. A at 77–78.

During the relevant time period, Jim Evans was Defendant's Regional Leader

---

1. It is unclear if Plaintiff complained to Mr. Bellwood at that time about the behavior of several men who worked in the warehouse or just about her immediate work area and Mr. Salinas and Mr. Bustos. At her deposition, in response to the question "can you identify for me the names of the people at PSS who you believe sexually harassed you?", Plaintiff responded "Richard Salinas, sorry, Steve Smith, Richie McWilliam, Carlos Cruz." DSOF, Ex. A at 39.

2. Mr. Salinas states in his deposition that the "hostile atmosphere" was greatly exaggerated by Plaintiff. Mr. Salinas stated that the quantity of workplace conversation decreased because his wife had cancer and Mr. Bustos'

wife was recovering from cancer, and because he and Mr. Bustos were very busy (the company moved warehouses at this time), in addition to his efforts to try to be "more professional," as Plaintiff had had requested. Mr. Salinas also stated that his personal attitude toward Plaintiff changed for various reasons not related to Plaintiff's complaint of vulgar language, including the fact that Plaintiff continued to smoke cigarettes after becoming pregnant and that Plaintiff was no longer doing her share of the necessary work. Plaintiffs' Statement of Facts in Support of Their Motion for Partial Summary Judgment, Ex. 10 at 71–75, 91–93.

for the Phoenix branch and Doug Maxwell was Defendant's Sales Leader for the Phoenix branch. Plaintiff asserts that in mid-April of 2001, Mr. Evans and Mr. Maxwell decided that they wanted to fire Plaintiff because she was pregnant. *See id.*, Ex. D. Plaintiff also alleges that these men acted in concert with Mr. Salinas and Mr. Bustos to make the work environment so hostile to Plaintiff that she would quit. *See id.*, Ex. A at 142. Plaintiff states:

I thought it was odd that I would announce my pregnancy and two weeks later have all of this fall in my lap. I never did get to the bottom of why my job was suddenly in question and by whom. I could no longer trust anyone. I asked for the severance package, and was going to leave the company. I received a phone call from Jeff Anthony, the Director of Human Resources on Wednesday, April 25th telling me he could not do the package with the insurance. I had no choice, I am pregnant, I am now forced to stay... Meetings were had with Jim Evans and our sales force, which I was told were part of who wanted me gone, and in that meeting Jim told them I was deciding whether or not to stay with the company.

*Id.*, Ex. D.

Mr. Salinas stated in his deposition that he had heard a "rumor" that Mr. Evans and Mr. Maxwell felt Plaintiff was not "pulling her weight" and that they wanted to "get rid of" Plaintiff. PSOF, Ex. 10 at 91–92. Mr. Salinas also stated that Plaintiff told him herself how much money she was paid by Defendant. *See id.*, Ex. 10 at 93.

At her deposition, in response to the question "if you could identify the names of the PSS employees who you believe took any kind of retaliatory action against you for making a complaint," Plaintiff stated: "Richard and Jesus. Richard Salinas,

Jesus Bustos." With further prompting, Plaintiff further stated "I know that Doug [Maxwell] and Mark [Bellwood] were trying to get me to leave. I don't know if their reasons were for my making that complaint, but it was shortly after I made my complaint." DSOF, Ex. A at 39–40. Plaintiff further stated that "possibly" Mr. Maxwell and Mr. Bellwood had retaliated against her, although she also stated that she did not believe Mr. Maxwell knew about her complaint. *See id.*, Ex. A at 145.

In late April of 2001 Plaintiff contacted the president of PSS, Doug Harper, about the hostile environment at the Phoenix branch purchasing department. *See* PSOF, Ex. 2. Mr. Harper referred her complaint to Mr. Evans, Defendant's Regional Leader for the area encompassing the Phoenix branch. *See id.*, Ex. 2.

In late May or early June of 2000, Victor Mondragon temporarily replaced Mr. Bellwood as the Phoenix branch Operations Leader. When Plaintiff complained about the hostile environment created by Mr. Salinas and Mr. Bustos to Mr. Mondragon on June 5, 2000, Mr. Mondragon allegedly offered to transfer Plaintiff to another department within the company, noting that she would have to take a pay decrease. *See* DSOF, Ex. A at 98. Plaintiff refused this suggestion. Mr. Mondragon referred Plaintiff's complaint to Defendant's corporate Human Resources department. *See id.*, Ex. D. Plaintiff asserts that Mr. Mondragon retaliated against her by "basically" supporting "whatever Richard and Jesus wanted ... by telling them that I made another complaint, you know, by telling them—I think he was the one that told them I was getting a lawyer. You know, I think he fueled the fire." *Id.*, Ex. A at 144.

On June 6, 2001, Plaintiff voluntarily began to work a different shift to minimize

contact with Mr. Bustos and Mr. Salinas, which change did not involve a pay decrease.[3]

On June 16, 2001, Plaintiff filed a claim of discrimination against Defendant with the EEOC. Plaintiff alleged that:

> Beginning in February 2001 and continuing, I have been subjected to a sexually tainted, hostile and intimidating work environment by two of my coworkers, Richard Salinas and Jesus Bustos. I have filed several complaints, the last being in June 2001. Despite my complaints to management, the employer has failed to take prompt and effective action. Furthermore, on April 9, 2001, I informed by supervisor I was pregnant. (sic) Since that time, I have been threatened with termination, being placed in a lower position and my salary cut. I believe I have been discriminated against because of sex, female, (pregnancy), and retaliated against in violation of Title VII of the Civil Rights Act of 1964, as amended.

*Id.*, Ex. C.

On June 26 or 27, 2001, Defendant's Director of Human Resources, Cindi Stone, contacted Plaintiff regarding her complaints to Mr. Mondragon, i.e., Plaintiff's complaints about the "hostile environment." *See id.*, Ex. G.

On June 28, 2001, in response to an overture from Defendant's Human Resources Department regarding her complaints of a hostile atmosphere, Plaintiff stated in an email to Ms. Stone:

> [W]e (you and I) are concentrating on the wrong problem. Yes, there has been a lot of vulgar activity from many people at this branch, but my problem now stems from my complaint I made

about this. Those types of behaviors have come to a NEAR stop, and I am now treated as an outcast. I truly believe that the goal is to get me to quit. *Id.*, Ex. G.

On July 13, 2001, the Phoenix branch's new Operations Leader, Bill Smith, told Plaintiff he wanted her to meet with Mr. Salinas, Mr. Bustos, Mr. Mondragon, Mr. Evans, and himself, to work to resolve the situation. Plaintiff stated: "No way. I called my lawyer and he recommends against it. . . . Bill feels we can work this out, I do not. I do not trust this company any longer." *Id.*, Ex. D.

In late July of 2001 Plaintiff experienced medical difficulties, and her doctor determined that she needed bed rest. *See id.*, Ex. A at 132. At that time, Plaintiff declined Defendant's written offer to remain off of work with full pay on leave until after she delivered her baby, with a guarantee that her job would be waiting for her when she was ready to return and that the leave would not be counted toward her FMLA entitlement. *See id.*, Ex. A at 172–73; Ex. H.

In response to Plaintiff's complaints to Mr. Mondragon, in late June 2001 Defendant's corporate Human Resources Department began an investigation as to Plaintiff's allegations of a hostile work environment. As a result of this investigation, on July 30, 2001, Ms. Stone sent a letter to Plaintiff regarding the steps taken by Defendant to address Plaintiff's complaints. *See id.*, Ex. I. Ms. Stone delineated the "remedial and preventative action" taken by Defendant, including "disciplinary action including management and non-management employees where substantiated incidents of inappropriate be-

---

**3.** Plaintiff stated in her deposition that having someone work the new shift "was actually something that had been tossed around months and months earlier . . ." DSOF, Ex. A at 99.

havior were confirmed," and "training specifically related to inappropriate behavior and sexual harassment in the workplace." *Id.*, Ex. I. Additionally, the Senior Vice President of Corporate Development scheduled a visit to the Phoenix branch to reiterate and reinforce the company's commitment to its sexual harassment policy, and Defendant "conducted sexual harassment training and offered counseling to new management personnel." *Id.*, Ex. I. Defendant also "counseled employees at the branch and issued PSS's World Medical, Inc.'s policy on Harassment/Unacceptable Work Behavior in the Workplace ... and informed appropriate employees not to retaliate against [Plaintiff] in any manner whatsoever ..." *Id.*, Ex. I.

On August 22, 2001, Defendant terminated Mr. Bellwood, who had been transferred to the corporation's Bountiful, Utah, facility. *See* PSOF, Ex. 6. On August 2, 2001, Mr. Smith and Mr. Salinas received written warnings stating that they had violated Defendant's policy on workplace behavior. *See id.*, Exs. 11 & 12.[4] Mr. Smith was suspended without pay for five days. *See id.*, Ex. 11.

Plaintiff remained away from her job and applied for and received short-term disability benefits from late July through September 28, 2001. *See* DSOF, Exs. K, N, O.

Plaintiff stated in her deposition that in late July or early August she still intended to return to work at PSS. *See id.*, Ex. A at 167. Plaintiff stated in her deposition that, as of October 2001, she was not really sure whether she was going back to work at PSS. *See id.*, Ex. A at 184.[5] Plaintiff did not, evidently, communicate to Defendant any intent to not return to work.

On October 8, 2001, Defendant sent a letter to Plaintiff asserting that Plaintiff had continued to remain away from work and was receiving short-term disability payments even though her doctor had initially released her to return to work on September 5. *See id.*, Ex. O. The letter stated that, because Plaintiff had "abandoned" her job by not returning to work and not informing her employer that she had been released to return to work, Defendant was terminating Plaintiff's employment. *See id.*, Ex. O.

In her deposition, Plaintiff stated that she did not have any benefits reduced while she was employed at PSS, and that she did not receive any poor performance evaluations. *See id.*, Ex. A at 209.

Plaintiff asserts in her motion for summary judgment that the following acts cre-

4. Defendant sent a similar letter to a Mr. Aarsvold, who evidently had instigated several of the instances of sharing pornography on computers in the workplace. *See* PSOF, Exs. 13 & 14.

5. In response to the question as to whether in October 2001 Plaintiff intended to return to work at PSS she responded: "Not really sure. I just knew I was still having the cramping and wasn't going back at least until that stopped or the baby was born." DSOF, Ex. A at 184.

Plaintiff was asked, during her deposition: "[W]hat was it at that time that made your working conditions so difficult? I can gather from your testimony that it was the way Richard and Jesus were treating you and they were talking about you to people in the branch and you felt that Jim Evans was trying to terminate you. Is there anything else in July [2001] you felt was making your working conditions so difficult that you didn't want to return?"

Plaintiff responded: "I was just so uncomfortable, so devastated, I was crushed by the whole thing."

Counsel responded: "And by the whole thing, you're talking about Richard and Jesus, their treatment, talking about you, Jim Evans. Anything else?"

To which Plaintiff replied: "No." DSOF, Ex. A at 210.

ated a sexually hostile atmosphere at PSS prior to February 2001: Steve Smith, a warehouse supervisor, simulated sex acts on office furniture in front of Plaintiff; Mr. Smith told Plaintiff he wanted to have sex with her; a co-worker, Mr. McWilliams, while massaging her neck, rubbed his genitals against Plaintiff; Plaintiff's co-workers downloaded and shared explicit pornography on office laptop computers in Plaintiff's presence; Plaintiff's co-workers engaged in sexually explicit conversation, jokes, and statements regarding the sexual attractiveness and sexual activity of other women in the office; Mr. Bellwood invited Plaintiff and her co-workers to join him at Phoenix strip bars.

The Court notes that in Plaintiff's affidavit of August 29, 2003, regarding the hostile environment, Plaintiff does not reiterate that Mr. Smith said he wanted to have sex with her, and Plaintiff does not reiterate that Mr. McWilliams, or any other individual, touched her inappropriately. *See* PSOF, Ex. 2.

Defendant contends that, prior to February 2001, Plaintiff initiated and participated in the sexually-explicit conversation and jokes at her workplace on a regular basis; that, prior to February 2001, Plaintiff initiated the sharing of pornography on a workplace computer; and that Plaintiff encouraged the fake masturbation display by Mr. Smith on at least one occasion; and that Plaintiff generally encouraged the sexually-oriented comments and actions of Mr. Salinas, Mr. Smith, and Mr. McWilliams. Mr. Salinas states in his deposition that, prior to February of 2000, Plaintiff was a "leader" regarding telling off-color jokes and "sharing the porn" in the workplace. *Id.*, Ex. 10 at 46.

## III. Analysis

Plaintiff seeks "partial summary judgment," on the issues of:

1. "the existence of and [Defendant's] liability for a hostile work environment;"

2. "defendant's liability [for] plaintiffs' claim [of] retaliation;"

3. "the inadequacy of defendant's termination of Mark Bellwood as a remedial measure in its defense."

Defendant seeks summary judgment on all of the counts presented in Plaintiffs' complaint.

### A. Title VII hostile environment

Plaintiff has alleged that she was subjected to gender-based discrimination, i.e., a work environment hostile to women, in violation of Title VII.

Title VII prohibits discrimination in the workplace based on the employee's gender. To succeed on a hostile environment claim, a female plaintiff must show that the workplace was, both objectively and subjectively, hostile to women, i.e., that a reasonable female would find the environment hostile and that the plaintiff subjectively perceived her environment to be abusive. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295 (1993); *Brooks v. City of San Mateo*, 229 F.3d 917, 924 (9th Cir. 2000); *Montero v. Agco Corp.*, 192 F.3d 856, 860 (9th Cir.1999). *See also Stahl v. Sun Microsystems, Inc.*, 19 F.3d 533, 538 (10th Cir.1994) ("If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination as a result of that environment.").

To be actionable, the workplace environment must be so offensive that the terms and conditions of the plaintiff's employment are actually altered. *See Pavon v. Swift Transp. Co., Inc.*, 192 F.3d 902,

908 (9th Cir.1999). A plaintiff establishes that the harassment was severe enough to alter the terms, conditions or privilege of employment by satisfying the subjective element of her Title VII hostile environment claim. *See Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 693 (7th Cir.2001) ("The requirement of subjectivity is intended to ensure that the plaintiff did actually feel harassed, because 'if the victim does not subjectively regard the environment as abusive, the conduct has not actually altered the victim's employment and there is accordingly no Title VII violation.' ").

Conduct must be extreme to amount to a change in the terms and conditions of employment. To be actionable under Title VII, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. Harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex. The motivation can be a general hostility to the presence of women in the workplace.

Courts are to determine whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Kortan v. California Youth Auth.*, 217 F.3d 1104, 1110 (9th Cir.2000) (internal citations and quotations omitted).

Defendant contends that Plaintiff initiated or participated in the creation of the allegedly gender-based hostile environment. If Plaintiff did participate in the acts of which she now complains, it is arguable whether the workplace could be found to be subjectively hostile. Additionally, the fact that Plaintiff now complains of acts contributing to a sexually hostile environment, i.e., Mr. McWilliams rubbing his genitals against her, and Mr. Smith's actions, when she apparently did not complain of these events to Mr. Bellwood and did not, apparently, include this behavior in her EEOC complaint, lends credence to the theory that Plaintiff did not find her work environment hostile on the basis of gender-based discrimination.

■ Plaintiff seeks summary judgment on the existence of a hostile work environment. Taking the facts in the light most favorable to Plaintiff, the Court concludes that there is a contested issue of material fact regarding Plaintiff's claim of a hostile environment, i.e., whether the workplace was subjectively hostile. Because there is a contested issue of material fact regarding an element of this claim on which Plaintiff bears the burden of proof, summary judgment in favor of Plaintiff on this claim is not warranted. *Cf. Cowan v. Prudential Ins. Co.*, 141 F.3d 751, 757 (7th Cir.1998) (declining to reverse summary judgment for the defendant, based on the proffered affidavit of the plaintiff's co-worker, because there was insufficient evidence in the record to conclude that the plaintiff found the workplace subjectively hostile). *See also Rennie v. Dalton*, 3 F.3d 1100, 1107 (7th Cir.1993) (quoting *Meritor*, stating: " 'The gravamen' of any sexual harassment claim is that the alleged sexual advances were 'unwelcome' . . . [T]he question whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact.").

Defendant seeks summary judgment in its favor on the claim that it is liable to

Plaintiff, pursuant to Title VII, for the existence of the alleged gender-based hostile environment. Defendant argues that it is entitled to summary judgment regarding Plaintiff's Title VII claim of a hostile work environment because, even allowing that the workplace was subjectively and objectively hostile, Defendant contends that it took prompt, adequate action to address Plaintiff's complaint's of a hostile work environment, which affirmative defense precludes a finding of liability pursuant to Title VII.

■ Plaintiff seeks to impose vicarious liability on the part of Defendant for the acts of Defendant's employees. Pursuant to the United States Supreme Court's holdings in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), an employer is only vicariously liable to an employee for a hostile environment when a supervisor with immediate or successively higher authority over the employee engaged in the prohibited conduct. *See Ellerth*, 524 U.S. at 765, 118 S.Ct. at 2270; *Faragher*, 524 U.S. at 807, 118 S.Ct. at 2292–93. Employers are not, by contrast, vicariously liable for a hostile work environment created by a "mere" co-worker of the plaintiff. *See Mack v. Otis Elevator Co.*, 326 F.3d 116, 123 (2d Cir.), *cert. denied*, 72 U.S.L.W. 3147, —— U.S. ——, 124 S.Ct. 562, 157 L.Ed.2d 428 (2003)

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. *The employer will be strictly liable for the hostile environment if the supervisor takes tangible employment action against the victim.* However, when an employee has established a

claim for vicarious liability but where no tangible employment action was taken, a defending employer may raise as an affirmative defense to liability or damages: "(a) that the employer exercised reasonable care to prevent and correct promptly any ... harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* at 807, 118 S.Ct. at 2292–93. Where the perpetrator of the harassment is merely a co-employee of the victim, the employer will be held directly liable if it knew or should have known of the harassing conduct but failed to take prompt remedial action.

*Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1278 (11th Cir.2002).

■ An employer is only strictly liable for a gender-based hostile work environment when that hostile environment is created by the plaintiff's immediate supervisor and the supervisor's gender-based animus results in an adverse employment action, such as discharge, a reduction in pay or other benefits, or a lost opportunity for advancement; a threat of an adverse employment action is not an "adverse employment action" imputing strict liability to the employer. *See Holly D. v. California Inst. of Tech.*, 339 F.3d 1158, 1170 (9th Cir.2003) ("[S]uch unconditional liability attaches only if a quid pro quo threat is implemented by some form of sufficiently concrete employment action. An unfulfilled, or inchoate, quid pro quo threat by a supervisor is not enough; something more is required."). *See also Mack*, 326 F.3d at 124 ("a tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer.").

■ In response to the question of which PSS employees created the hostile

work environment, at her deposition Plaintiff responded: "Richard Salinas, sorry, Steve Smith, Richie McWilliam, Carlos Cruz." Taking Plaintiff's allegations in the light most favorable to Plaintiff, the hostile work environment was not created by any PSS "supervisory employee" because none of these individuals, i.e., Mr. Salinas, Mr. Smith, Mr. McWilliam, or Mr. Cruz, had immediate or successively higher authority over Plaintiff.[6] Additionally, with respect to the existence of a "hostile environment," as distinguished from her retaliation claim, Plaintiff does not allege that she was subjected to an adverse employment action by a supervisory employee and, therefore, Defendant is not strictly or vicariously liable for the alleged hostile environment.

██ Because the alleged hostile environment was created by Plaintiff's coworkers, i.e., Mr. Smith, Mr. McWilliams, Mr. Salinas, and Mr. Cruz, and because Defendant was not subjected to an adverse employment action in the context of the hostile environment, Defendant is entitled to assert an affirmative defense to Plaintiff's claim for damages pursuant to Title VII, i.e., that Defendant took prompt remedial action to address discrimination of which it knew or should have known.

Defendant seeks summary judgment on its assertion that, as a matter of law, it took prompt remedial action to end the harassment. Plaintiff alleges that Defen-

dant did not promptly or adequately address Plaintiff's complaints.

██ The Court concludes that there are contested issues of material fact as to whether Defendant's response to Plaintiff's complaint was prompt and adequate. Therefore, Defendant is not entitled to summary judgment on the issue of whether Defendant is liable for any alleged hostile environment because Defendant's actions constituted prompt remedial action.

## B. Title VII retaliation

To prevail on this claim, Plaintiff must establish that she engaged in activity protected by Title VII, that she was subjected to an adverse employment action, and that there was a causal link between the protected activity and the adverse employment action. *See, e.g., EEOC v. Dinuba Med. Clinic,* 222 F.3d 580, 586 (9th Cir. 2000).

We recently set out the peculiar dynamics of a retaliation claim under Title VII in *Payne v. Norwest Corp.,* 113 F.3d 1079 (9th Cir.1997). We noted that a plaintiff must show (1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two. ... *Among those employment decisions that can constitute an adverse employment action are termination, dissemination of a negative*

---

**6.** Plaintiff asserts that because Mr. Smith was a manager at PSS, Defendant is vicariously liable for Mr. Smith's behavior in creating the hostile environment. However, the evidence before the Court indicates that Mr. Smith did not have immediate or successive supervisory authority over Plaintiff and, therefore, Mr. Smith's actions are not those of a "supervisor" for purposes of imputing liability to Defendant for a gender-based hostile environment.

The Court notes that Mr. Bellwood was Plaintiff's direct supervisor. Mr. Bellwood's act of inviting Plaintiff and her co-workers to

strip bars is not a gender-based act establishing a hostile work environment. The federal courts have concluded that, while perhaps boorish behavior, employees visiting or discussing their visits to establishments which cater to a male clientele does not create a hostile work environment. *See Gupta v. Florida Bd. of Regents,* 212 F.3d 571, 584 (11th Cir.2000); *Farpella–Crosby v. Horizon Health Care,* 97 F.3d 803, 806 (5th Cir.1996); *Rennie v. Dalton,* 3 F.3d 1100 (7th Cir.1993); *Gautney v. Amerigas Propane, Inc.,* 107 F.Supp.2d 634, 644 (E.D.Pa.2000).

*employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion.* By contrast, we have held that declining to hold a job open for an employee and badmouthing an employee outside the job reference context do not constitute adverse employment actions. *Brooks,* 229 F.3d at 928 (emphasis added). The Ninth Circuit, while adopting an "expansive view" of what constitutes an "adverse employment action," *Ray v. Henderson,* 217 F.3d 1234, 1241–42 (9th Cir.2000), has also made it clear that "only non-trivial employment actions that would deter reasonable employees from complaining about Title VII violations will constitute actionable retaliation." *Brooks,* 229 F.3d at 928. The Ninth Circuit Court of Appeals has concluded that an action is cognizable as an adverse employment action if it is "reasonably likely to deter employees from engaging in protected activity." *Ray,* 217 F.3d at 1243.

The parties do not contest that Plaintiff engaged in protected activity, i.e., that she complained about a sexually hostile environment in the workplace. The parties do disagree as to whether Plaintiff was subjected to an adverse employment action as a matter of law.

Plaintiff alleges the following retaliatory acts: she started getting bad performance reviews; her employer disclosed information regarding her salary to her "harassers;" Plaintiff started working a different shift to get away from her harassers; her supervisors and co-workers started a campaign to get Plaintiff fired; Mr. Mondragon offered to transfer her to another position with a salary reduction.

Defendant contends that it is entitled to summary judgment on this claim because Plaintiff's allegations are insufficient to establish an adverse employment action as a matter of law.

It is arguable whether bad performance reviews and a "campaign" to get Plaintiff fired or to force her to quit, if these facts are ultimately proved, would constitute adverse acts or "ultimate employment decisions." *See Brooks,* 229 F.3d at 928–29 (concluding that termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion, are adverse actions, but declining to hold a job open for an employee, bad-mouthing an employee outside the job reference context, and transferring an employee where salary is unaffected do not constitute adverse employment actions). Regarding Mr. Mondragon's offer to transfer Plaintiff with a reduction in pay, in the context of a Title VII retaliation claim it is unclear if the "threat" of an adverse action itself constitutes an adverse employment action. *See Fielder v. UAL Corp.,* 218 F.3d 973, 996 n. 9 (9th Cir.2000) (Kleinfeld, J., dissenting), *rev'd on other grounds by* 536 U.S. 919, 122 S.Ct. 2583, 153 L.Ed.2d 773 (2002). The case cited by Defendant for this proposition of law, *Vasquez v. County of Los Angeles,* 307 F.3d 884 (9th Cir.2002), has been withdrawn by the Ninth Circuit Court of Appeals. *See Vasquez v. County of Los Angeles,* 349 F.3d 634 (9th Cir.2003). *Compare Lyons v. England,* 307 F.3d 1092, 1118 (9th Cir. 2002).

 As a matter of law, Plaintiff's voluntary transfer to a different work shift without any decrease in remuneration does not constitute an adverse employment action on the part of Defendant. *See Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1465 (9th Cir.1994) ("[the plaintiff] first points to her transfer to day shift from swing shift, as a result of her letter to management stating that Trenkle was still harassing her. While this action was an instance of insufficient remediation .... it

was not retaliatory in nature."). Additionally, Plaintiff's primary complaint regarding retaliation, that her co-workers ostracized her, is not actionable retaliation. *See Manatt v. Bank of America,* 339 F.3d 792, 803 (9th Cir.2003) (concluding that ostracism by co-workers, even when encouraged by the plaintiff's supervisor, does not constitute a retaliatory act); *Brooks,* 229 F.3d at 929; *Roberts v. Segal Co.,* 125 F.Supp.2d 545, 549 (D.D.C.2000) ("The fact that plaintiff believes she was getting the cold shoulder from her co-workers does not constitute a materially adverse consequence or disadvantage in the terms and conditions of her employment so as to establish an adverse personnel action."). *Compare Strother v. Southern Cal. Permanente Med. Group,* 79 F.3d 859, 869 (9th Cir.1996) (noting that "mere ostracism in the workplace is not enough to show an adverse employment decision," but that being excluded from meetings, being denied telephone access, suffering some verbal and physical abuse at the hands of other doctors, being denied secretarial support, and being given a more burdensome work schedule, "if proven, would be sufficient to demonstrate an adverse employment decisions.").

 There are contested issues of material fact regarding whether Plaintiff was subjected to an adverse employment action, i.e., negative performance reviews and a "campaign" to force her to quit, and whether any alleged retaliation was the result of Plaintiff's complaints or for legitimate non-discriminatory reasons; therefore, summary judgment on this claim is not appropriate. *See Ray,* 217 F.3d at 1246; *Brooks,* 229 F.3d at 929 (noting that "an undeserved negative performance review can constitute an adverse employment decision.").

## C. Title VII constructive discharge

 Constructive discharge is an adverse employment action for the purposes of establishing a retaliation claim pursuant to Title VII. *See Jordan v. Clark,* 847 F.2d 1368, 1377 (9th Cir.1988). Constructive discharge occurs when an employer intentionally creates, or knowingly permits, discriminatory conditions so intolerable that they effectively force an employee to resign. *See Brooks,* 229 F.3d at 930. The standard for determining constructive discharge is an objective standard, i.e., whether a reasonable employee would feel compelled to quit. *See id.*

 To survive summary judgment on a claim for constructive discharge, the plaintiff must show that "there are issues of fact as to whether a reasonable person in her position would have felt that she was forced to quit because of intolerable or discriminatory work conditions." *Schnidrig v. Columbia Mach., Inc.,* 80 F.3d 1406 (9th Cir.1996).

> In order to survive summary judgment on her constructive discharge claim, [the plaintiff] must show a triable issue of fact as to whether "a reasonable person in [her] position would have felt that [she] was forced to quit because of intolerable and *discriminatory* working conditions." *Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1465 (9th Cir.1994) (quotation marks and citation omitted) (alterations in original). We have held that in order to establish constructive discharge, a plaintiff *"must at least show some aggravating factors, such as a continuous pattern of discriminatory treatment."* *Thomas v. Douglas,* 877 F.2d 1428, 1434 (9th Cir.1989) (quotation marks and citation omitted).

*Bergene v. Salt River Project Agric. & Improvement Dist.,* 272 F.3d 1136, 1143–44 (9th Cir.2001) (emphasis added). "Summary judgment is therefore appropri-

ate on a constructive discharge claim where the 'decision to resign [was] unreasonable as a matter of law.' " *Lawson v. Washington,* 296 F.3d 799, 805 (9th Cir. 2002), *quoting King v. AC & R Advertising,* 65 F.3d 764, 767 (9th Cir.1995).

Defendant contends that Plaintiff was actually fired from her employment. Defendant asserts that Plaintiff was fired because she failed to return to work and she was receiving short-term disability payments from the employer's insurer without telling her employer that she had been cleared by her doctor to return to work.

[18] Plaintiff raises no real argument regarding her constructive discharge, i.e., that she did not quit her employment but, rather, was terminated on October 8, 2001. Plaintiff did not really contest Defendant's argument in this regard during oral argument before the Court. With regard to the record evidence before the Court, Plaintiff stated in her deposition that, prior to receiving a termination letter from Defendant, she was "not sure" whether or not she would return to work, and that her decision was primarily based on the status of her pregnancy, rather than her workplace conditions. Therefore, the Court concludes that, as a matter of law, Plaintiff was not constructively discharged from her employment because at no time did Plaintiff evidently determine that the working conditions at PSS were so intolerable that she, much less a "reasonable" employee, would feel compelled to quit. *See French v. Eagle Nursing Home, Inc.,* 973 F.Supp. 870, 877–78 (D.Minn.1997) ("The only logical conclusion that the Court can draw from [plaintiff's] wish to return to [employer] is that the working conditions there were in fact not intolerable.").

Because Plaintiff has not produced evidence that she quit her employment or that she quit her employment because her workplace was intolerable, Defendant is entitled to judgment as a matter of law on Plaintiff's claim that she was constructively discharged from her employment.

**D. Intentional infliction of emotional distress**

[19] A federal court exercising jurisdiction over an ancillary state law claim must apply the substantive law of the state in which the claim is brought. *See Mayview Corp. v. Rodstein,* 620 F.2d 1347, 1357 n. 7 (9th Cir.1980).

[20] Pursuant to Arizona law, the three elements required to find liability based on the tort of intentional infliction of emotional distress are: (1) the conduct by the defendant must be extreme and outrageous; (2) the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his conduct; and (3) severe emotional distress must indeed occur as a result of defendant's conduct. *See Watts v. Golden Age Nursing Home,* 127 Ariz. 255, 258, 619 P.2d 1032, 1035 (1980).

> Arizona courts have refused to allow plaintiffs to prevail in such claims unless defendant's conduct is found to be extraordinary. "A plaintiff must show that the defendant's acts were 'so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.' " *Mintz v. Bell Atlantic Systems Leasing,* 183 Ariz. 550, 905 P.2d 559, 563 (Ariz.App.1995)

*Tempesta v. Motorola, Inc.,* 92 F.Supp.2d 973, 987 (D.Ariz.1999). *See also Rowland v. Union Hills Country Club,* 157 Ariz. 301, 304, 757 P.2d 105, 108 (Ariz.App.1988) (upholding summary judgment for defendant on the plaintiff's claim of intentional infliction of emotional distress because the

"conduct complained of" ... [was] not so far outside the bounds of decency as to cause a reasonable person, upon hearing of it, to shout, "Outrageous!").

In her pleadings, Plaintiff asserts that Defendant's behavior in addressing her complaints of harassment was sufficiently egregious that it constitutes intentional infliction of emotional distress. At oral argument, Plaintiff's counsel argued that Mr. McWilliams rubbing his crotch against Plaintiff constituted "outrageous" conduct, in addition to Mr. Maxwell and Mr. Evans allegedly seeking to have Plaintiff fired.

Defendant argues that Plaintiff has failed to demonstrate extreme and outrageous conduct as a matter of law.

Plaintiff alerted her immediate supervisor to her perceptions of a sexually hostile environment and the behavior of which Plaintiff complained ceased almost immediately. Additionally, when Plaintiff complained to Mr. Mondragon on June 6 about her co-workers' ostracism of her, he relayed this complaint to the corporate Human Resource department which initiated an investigation of Plaintiff's complaints within three weeks. Within three months of Plaintiff's complaint to Mr. Mondragon, Defendant investigated and addressed Plaintiff's complaints, including retraining its employees and censuring several employees.

The Court concludes that, as a matter of law, Defendant's behavior in addressing Plaintiff's claims was not "extreme and outrageous," nor does Defendant's behavior show an intent to harm Plaintiff or a reckless disregard that Plaintiff would be harmed. *See Thomas v. Douglas,* 877 F.2d 1428, 1435 (9th Cir.1989); *Tempesta,* 92 F.Supp.2d at 987; *Spratt v. Northern Auto. Corp.,* 958 F.Supp. 456, 461 (D.Ariz. 1996). *See also Mintz v. Bell Atl. Sys. Leasing Int'l, Inc.,* 183 Ariz. 550, 554, 905 P.2d 559, 563 (Ariz.App.1995) ("A plaintiff must show that the defendant's acts were 'so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'"). Mr. McWilliams' behavior was apparently not so extreme or outrageous that Plaintiff found it necessary to complain about his behavior specifically to Mr. Bellwood at the time that she complained of Mr. Bustos and Mr. Salinas' language, nor was this behavior so outrageous that Plaintiff complained of it in her EEOC complaint. Additionally, Plaintiff provides no evidence, other than her statements in her complaint, that she experienced any "severe" emotional distress as a direct result of Defendant's behavior.

Because there are no disputed issues of material fact with regard to this claim, and because, as a matter of law, Defendant's conduct was not extreme and outrageous, nor apparently intended to harm Plaintiff or in reckless disregard of harm to Plaintiff, Defendant's are entitled to summary judgment on Plaintiff's claim of intentional infliction of emotional distress.

### E. "Negligent supervision"

Plaintiff's fifth claim for relief alleges that Defendant was negligent in supervising its employees, resulting in "shock, mental anguish and other emotional distress" to Plaintiff. First Amended Complaint at 19. As stated supra, a federal court exercising jurisdiction over an ancillary state law claim must apply the substantive law of the state in which the claim is brought. *See Mayview Corp.,* 620 F.2d at 1357 n. 7.

Defendant asserts that Plaintiff's claim based upon Defendant's alleged negligence is barred pursuant to the exclusive remedy

provisions of Arizona's workers compensation statutes, which provide that:

A. The right to recover compensation pursuant to this chapter for injuries sustained by an employee or for the death of an employee is the exclusive remedy against the employer or any co-employee acting in the scope of his employment, and against the employer's workers' compensation insurance carrier or administrative service representative, except as provided by § 23–906, and except that if the injury is caused by the employer's wilful misconduct, or in the case of a co-employee by the co-employee's wilful misconduct, and the act causing the injury is the personal act of the employer, or in the case of a co-employee the personal act of the co-employee, or if the employer is a partnership, on the part of a partner, or if a corporation, on the part of an elective officer of the corporation, and the act indicates a wilful disregard of the life, limb or bodily safety of employees, the injured employee may either claim compensation or maintain an action at law for damages against the person or entity alleged to have engaged in the wilful misconduct.

B. "Wilful misconduct" as used in this section means an act done knowingly and purposely with the direct object of injuring another.

Ariz.Rev.Stat. Ann. §§ 23–1022(A) & 23–1022(B) (1995 & Supp.2003).

Plaintiff contends that there are statutory exceptions to the exclusive remedy provision which allow Plaintiff's negligence claim. Specifically, Plaintiff cites Arizona Revised Statutes § 23–1043.01(B), which provides:

A mental injury, illness or condition shall not be considered a personal injury by accident arising out of and in the course of employment and is not compensable pursuant to this chapter unless some unexpected, unusual or extraordinary stress related to the employment or some physical injury related to the employment was a substantial contributing cause of the mental injury, illness or condition.

Interpreting this exception to the exclusive remedy provision the Arizona Court of Appeals has stated:

It is well settled that work-related injury claims are generally redressed exclusively under Arizona's workers' compensation scheme. A.R.S. § 23–1022. ... However, article XVIII, § 8, of the Arizona Constitution allows an employee who would otherwise be barred by the workers' compensation exclusivity provision to sue his or her employer if the employee has suffered an injury caused by the employer's wilful misconduct or an injury that is "the result of an act done by the employer or a person employed by the employer knowingly and purposefully with the direct object of injuring another, and the act indicates a wilful disregard of the life, limb or bodily safety of employees." This constitutional guarantee is codified in § 23–1022(A), which allows an injured employee to "either claim compensation or maintain an action at law for damages against the person or entity alleged to have engaged in the wilful misconduct."

*Gamez v. Brush Wellman, Inc.*, 201 Ariz. 266, 269, 34 P.3d 375, 378 (Ariz.App.2001).

The exclusive remedy provisions of Arizona's workers compensation statutes do not apply when the employee's injury is caused by an employer's "willful misconduct," which is defined as "an act done knowingly and purposely with the direct object of injuring another." Ariz. Rev.Stat. Ann. §§ 23–1022(A) & 23–1022(B) (1995 & Supp.2003). Even acts classified as gross negligence, or wantonness amounting to gross negligence, do not

constitute a "willful act" under this definition; the alleged negligence or wantonness must be accompanied by the employer's intent to inflict injury upon the employee. *Cf. Diaz v. Magma Copper Co.*, 190 Ariz. 544, 551, 950 P.2d 1165, 1172 (Ariz.App. 1997) (holding that the defendant employer's acts did not constitute willful misconduct, even though the defendant employer ignored safety hazards and delayed the access of paramedics to the employee until the employee was extricated from a mine, because there was no evidence that the employer's objective was to injure the deceased).

 The Arizona courts are reluctant to find that employers have acted with wilful misconduct regarding even an employee's physical safety:

> Gross negligence is not sufficient to establish wilful misconduct under § 23–1022. The "direct object" of the employer's actions must have been to "injur[e] another." § 23–1022(B); *see Allen v. Southwest Salt Co.*, 149 Ariz. 368, 718 P.2d 1021 (Ariz.App.1986). Generally, this means that the employer's liability cannot ... be stretched to include accidental injuries caused by the gross, wanton, wilful, deliberate, intentional, reckless, culpable, or malicious negligence, breach of statute, or other misconduct of the employer short of a conscious and deliberate intent directed to the purpose of inflicting an injury.

> Even if the alleged conduct goes beyond aggravated negligence, and includes such elements as knowingly permitting a hazardous work condition to exist, knowingly ordering employees to perform an extremely dangerous job, wilfully failing to furnish a safe place to work, wilfully violating a safety statute, ... or withholding information about worksite hazards, the conduct still falls short of the kind of actual intention to injure that robs the injury of accidental character.

*Gamez*, 201 Ariz. at 269, 34 P.3d at 378 (some internal citations omitted).

Defendant's argument that Plaintiff's claim for negligent supervision is precluded is based primarily on the conclusion reached by the Arizona Court of Appeals in *Irvin Investors Inc. v. Superior Court*, 166 Ariz. 113, 800 P.2d 979 (Ariz.App. 1990). In *Irvin Investors* the Arizona Court of Appeals examined the exclusivity provisions of Arizona's workers compensation statutes as precluding a state court cause of action for negligence against an employer. In *Irvin Investors*, the plaintiff sued her employer alleging that she suffered psychological injuries as a result of being sexually molested by a coworker. The Arizona trial court denied the defendant employer's motion for summary judgment as to the plaintiff's claim of negligent infliction of emotional distress.[7]

On appeal, the Arizona Court of Appeals held that the plaintiff's psychological injury was a mental condition caused by unexpected, unusual or extraordinary stress related to her employment and, therefore, that the injury was compensable under Arizona's workers compensation laws and, therefore, presumptively precluded by the

---

7. *Irvin Investors v. Superior Court*, involved an employee at a fast-food restaurant who was sexually assaulted, on two occasions, by a coworker who had previously molested another employee at the restaurant. Her action against the employer was for the psychological injuries she suffered and was based on a claim of negligent hiring and negligent retention. The Arizona Court of Appeals held that Arizona's workers compensation statutes, specifically Arizona Revised Statutes. §§ 23–906(A) and 23–1022, precluded the employee from bringing a tort action based on negligent hiring and negligent retention. The court stated that, under the facts of that case, the stress to which the employee was subjected fell into the category of unexpected, unusual, or extraordinary.

exclusive remedy provisions. The Arizona Court of Appeals further concluded that the plaintiff could not bring a tort action against her employer for her psychological injuries unless she provided evidence of intentional conduct or reckless disregard by employer. *See* 166 Ariz. at 115, 800 P.2d at 981.

Plaintiff's argument that this claim for relief should not be dismissed is predicated by a decision issued prior to *Irvin Investors*, i.e., *Ford v. Revlon*, in which the Arizona Supreme Court concluded that a plaintiff's claim of intentional infliction of emotional distress was not barred by the exclusive remedy provision of Arizona Workers' Compensation laws. *See* 153 Ariz. 38, 44, 734 P.2d 580, 586 (1987).

Plaintiff did not plead her sixth claim for relief as negligent infliction of emotional distress, but instead alleged that Defendant was negligent in supervising its workplace such that Plaintiff was subjected to a hostile atmosphere.[8] The Court concludes that Plaintiff has not alleged facts sufficient to support a conclusion that Defendant's acts were intentional conduct calculated to harm Plaintiff; this claim for relief is based on an allegation of negligence, rather than conduct intentionally designed to harm Plaintiff, in contrast to Plaintiff's claim for relief based on intentional infliction of emotional distress.

▇▇▇ The Court concludes that *Irvin Investors* is more closely related to the instant matter than the *Ford* case, because in *Irvin Investors* the court addressed a plaintiff's claim of negligent retention and negligent hiring, the same claim pled by Plaintiff, while the *Ford* case addressed a claim of *intentional* infliction of emotional distress, which requires that the plaintiff show that the defendant's acts were intentional, i.e., that the defendant's acts per se fit the exception to the exclusive remedy provision of Arizona's workers compensation statutes. The cases may be reconciled to stand for the proposition that a negligence claim is precluded by the workers compensation statutes while a claim for intentional infliction of emotional distress is not precluded.

▇▇▇ Because, pursuant to the holding in *Irvin Investors*, Arizona law precludes an employee from bringing a tort action based on negligent hiring and negligent retention against their employer, Defendant is entitled to judgment as a matter of law in its favor on Plaintiff's claim of negligence.

---

8. Plaintiff alleges that:
 The employees and agents of PSS intentionally, maliciously and in reckless disregard of Debbie's welfare and rights acted in a manner so outrageous in character and so extreme in degree, as to go beyond all bounds of decency and their conduct should be regarded as atrocious and utterly intolerable in a civilized community.
 PSS officers and executives were fully aware of the continued and on-going harassing conduct and had a duty to investigate, address and prevent further such conduct from occurring once Debbie had placed PSS on notice that such activities were taking place.
 PSS breached its duty to Debbie by failing to take adequate and appropriate measures to prevent further harassment and retaliatory actions against her after receiving adequate notice of the harassing and hostile work environment.

 * * * * * *

 The acts committed against Debbie were designed to cause her shock and mental anguish.

 * * * * * *

 The conduct of PSS constituted reckless indifference to the protected rights of [Plaintiff] . . .
 The conduct of PSS constituted wilful and wanton disregard for the interests of [Plaintiffs].
 Amended Complaint at 14–15.

### F. Loss of consortium

This claim is pled by Plaintiff Conrad Mosakowski as an ancillary state law claim.

Defendant states that this is a derivative claim, requiring Plaintiffs to establish an underlying tort. Because Plaintiffs cannot establish an underlying tort, Defendants argue, Plaintiff's husband cannot prevail on a loss of consortium claim.

To succeed on this claim, Plaintiffs must establish that Defendant committed a tort against Plaintiff Debbie Mosakowski. *See Barnes v. Outlaw,* 192 Ariz. 283, 286, 964 P.2d 484, 487 (1998) ("because loss of consortium is a derivative claim ... all elements of the underlying cause must be proven"). A violation of Title VII does not support a loss of consortium claim as a matter of law. *See Durley v. APAC, Inc.,* 236 F.3d 651, 658 (11th Cir.2000); *Smith v. Auburn Univ.,* 201 F.Supp.2d 1216, 1228 (M.D.Ala.2002); *Chergosky v. Hodges,* 975 F.Supp. 799, 801 (E.D.N.C.1997) *Franz v. Kernan,* 951 F.Supp. 159, 162 (E.D.Mo.1996); *Murphy v. Cadillac Rubber & Plastics, Inc.,* 946 F.Supp. 1108, 1125 (W.D.N.Y.1996).

Because the Court has concluded that Defendant is entitled to summary judgment on Plaintiff Debbie Mosakowski's claims of intentional infliction of emotional distress and negligence, Defendant is entitled to summary judgment on Plaintiff Conrad Mosakowski's claim of loss of consortium.

### IV. Conclusion

Defendant's Motion for Summary Judgment must be granted and judgment as a matter of law entered in favor of Defendant with regard to all of Plaintiffs' claims for relief based on intentional infliction of emotional distress, negligence, and loss of consortium. Taking the facts in the light most favorable to Plaintiff, Defendant's acts in addressing Plaintiff's complaints were not extreme and outrageous. The Court further concludes that Plaintiff's negligence-based claim is barred by Arizona's workers compensation statutes' exclusive remedy provisions.

Additionally, Defendant's Motion for Summary Judgment must be granted and judgment as a matter of law entered in favor of Defendant with regard to Plaintiff's claim that Defendant constructively discharged her as an act of retaliation in violation of Title VII. Plaintiff did not quit her employment and Plaintiff's own deposition statements indicate that Plaintiff did not find the workplace so intolerable that she could not return to work. The Court concludes that, as a matter of fact, Defendant terminated Plaintiff's employment because Plaintiff had in effect abandoned her job and continued to receive disability benefits after her doctor had released her to return to work.

Defendant's Motion for Summary Judgment in its favor with regard to Plaintiff's claim that Defendant is liable to Plaintiff for a hostile work environment in violation of Title VII must be denied because the Court concludes that there is a material issue of fact regarding the adequacy of Defendant's acts in addressing Plaintiff's claims regarding a hostile environment. Similarly, Defendant's Motion for Summary Judgment in its favor with regard to Plaintiff's claim that Defendant retaliated against her for exercising a protected right pursuant to Title VII must be denied because some of the acts of which Plaintiff complains, if proved to be retaliatory, could be found as a matter of law to be adverse employment action.

Plaintiffs' motion for judgment as a matter of law that a hostile environment existed in violation of Title VII must be denied because Plaintiff has not established as a

matter of undisputed fact that the workplace was subjectively hostile. Additionally, Plaintiff's motion for judgment as a matter of law that Defendant is liable for the existence of the alleged hostile environment must be denied because there are disputed issues of material fact regarding whether Defendant's acts were sufficient and prompt as a matter of law. Plaintiff's motion for judgment as a matter of law that Defendant is liable to Plaintiff on her claim of retaliation in violation of Title VII must be denied because there is a disputed issue of fact regarding whether any acts taken by Defendant or its agents were based on discriminatory reasons. Plaintiff's motion seeking judgment as a matter of law on the "inadequacy of defendant's termination of Mark Bellwood as a remedial measure in its defense" must be denied because Defendant's termination of Mr. Bellwood is relevant to the issue of whether Defendant took prompt remedial action in response to Plaintiff's claim of harassment.

**THEREFORE, IT IS ORDERED THAT:**

1. Plaintiff's motion for partial summary judgment [Docket No. 72] is **denied** in its entirety.

2. Defendant's motion for summary judgment [Docket No. 74] is **granted in part and denied in part.** Defendant's motion is granted as to Plaintiffs' claims based upon constructive discharge in violation of Title VII; and is **granted** as to Plaintiffs' claims based on negligence and intentional infliction of emotional distress; and is **granted** as to Plaintiff Conrad Mosakowski's claim for loss of consortium.

Defendant's motion for summary judgment is **denied** as to Plaintiff's claim that she was subjected to a gender-based hostile work environment in violation of Title VII and **denied** as to Plaintiff's claim that Defendant retaliated against her for engaging in a protected activity in violation of Title VII.

**FURTHERMORE, IT IS ORDERED THAT**, having granted Defendant's motion for summary judgment with respect to Plaintiff's claim of negligence, Defendant's motion for judgment on the pleadings regarding Plaintiff's negligence claim [Docket No. 62] is **denied as moot.**